(No. 33858.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CALVIN DONALDSON, Plaintiff in Error.

*Opinion filed May 23, 1956.*

EDMUND H. GRANT, of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, State's Attorney, of Chicago, (FRED G. LEACH, EDWIN A. STRUGALA, IRWIN D. BLOCH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, WILLIAM L. CARLIN, and ROBERT J. SMITH, of counsel,) for the People.

Per CURIAM : Calvin Donaldson, hereinafter referred to as the defendant, was one of three men jointly indicted for the murder of Ferdinand Wesley which occurred in the city of Chicago on April 13, 1954. His two alleged accomplices were apprehended and thereafter pleaded guilty to this charge. Donaldson submitted his cause to a jury trial which commenced in the criminal court of Cook County on January 10, 1955, and which resulted in a verdict finding the defendant guilty of murder and fixing his pun-

ishment at death. From the judgment and death sentence which then followed, writ of error has now been prosecuted to this court.

The record indicates that at approximately 9:25 P.M. on the evening of April 13, 1954, three men entered the Match Box Tavern located at 770 Milwaukee Avenue, Chicago, and announced that it was a "stick-up." Thereupon, one of the three men produced a gun, and during the events which followed, fired one shot which wounded the owner and bartender, Bernard Dorenfest, and killed Wesley.

The bartender, Dorenfest, was the only eyewitness who testified in this case. He stated that he was tending bar on the evening in question when the trio entered from Milwaukee Avenue and announced the robbery. The armed bandit, whom he identified as the defendant, then walked behind the bar and said "I am going to get myself a white * * * man to kill somebody over here." Thereupon, according to Dorenfest, the defendant and his accomplices ordered the tavern customers, approximately ten in number, to the rear of the building and then proceeded to open the cash register and take its contents. Once this had been accomplished, the bandits demanded to know where the "good whiskey" was, and after it was pointed out, the two unarmed members each left the tavern carrying a case of the liquor. At that point, said Dorenfest, the defendant walked towards him, aimed, and fired one shot in the direction of his head. Dorenfest put up his hands to protect himself, and as he did so, the bullet pierced his hand and shoulder, and struck Wesley, killing him almost instantly. On cross-examination, the bartender admitted that he was not certain which of the bandits first entered the tavern and produced the gun but was positive that Donaldson was present and did the shooting. He further stated that upon being released from the hospital following the robbery, he identified the two accomplices at a police "line-up" and also recognized Donaldson's picture from about a

dozen that had been furnished him for that purpose. Dorenfest also admitted that the first time he had seen the defendant since the shooting was at the time of trial, but was somewhat evasive as to whether or not Donaldson had been pointed out to him in that instance.

John McNally, a Chicago police officer, testified that his department was notified by the New Orleans police department on June 30, 1954, that Donaldson was in their custody, and that he and another officer proceeded to New Orleans to pick up the prisoner. Upon arriving, they talked to the defendant but were informed that he did not wish to make any statements. However, according to McNally, on the return trip to Chicago, the defendant said: "I was in on the robbery when another man handed me a gun, the gun went off accidentally." This witness also stated that he was present when Donaldson was questioned concerning the crime and when Dorenfest identified the defendant's photograph.

Robert Garrou, another police officer, testified that he was on duty during the evening in question and about 9:30 P.M. received a call that there was a shooting at the Match Box Tavern. He immediately proceeded to the scene of the crime and found the bartender bleeding from his shoulder and hand. The deceased was lying face down upon the floor and there were three other people in the establishment at that time. During his testimony, Garrou was asked whether a photograph, marked as People's exhibit 1, gave a true representation "of the appearance of the head of the man that you saw on the floor on April 13, 1954, in the tavern at 770 N. Milwaukee Avenue," to which he replied, "It does. It seems a little swollen up since then, though." Thereafter the exhibit was received in evidence.

The State then called Joseph Tournier, who testified that he was a shorthand reporter for the Cook County State's Attorney's office, that he was present at the detective bureau at 5:00 A.M. on the morning of July 4, 1954, when

a Calvin *Donelson* was interrogated by assistant State's Attorney Ferlic, that he took and transcribed the conversation that there took place, that it was the same as was contained in a 57-page unsigned statement marked as People's exhibit 2, but that he did not know whether the man who answered the questions was the defendant nor would he recognize this man if he saw him again.

At the court's suggestion, John McNally was recalled to the stand to testify that the defendant was in fact the one who had been interrogated. He stated that he was present at the questioning and that the man who answered the questions was sitting in the court room, "the second man from the left." At that point, the typewritten statement was received in evidence over defendant's objection.

For the defense, Donaldson testified that his home was in New Orleans but that he had come to Chicago some years ago and had served a prison term at Joliet for armed robbery. He stated that he left Chicago to visit a brother in Nashville, Tennessee, on April 12, 1954, and arrived in Nashville on April 14. From there he later went to Cairo, Illinois, and then to New Orleans. Donaldson denied, however, that he took part in the robbery or that he had made the statements attributed to him and contained in People's exhibit 2.

Frank Ferlic, an assistant State's Attorney who was called as a rebuttal witness by the prosecution, stated that he was present at the instant interrogation and that the defendant was the same person who made the statements contained in People's exhibit 2.

As grounds for reversal, the defendant first contends that the trial court erred in admitting People's exhibit 1 because of its inflammatory character. He argues that the parties had already stipulated that if the chief pathologist for the Cook County coroner were called he would testify that he examined the body of one Ferdinand Wesley at the county morgue and that the cause of death was "a bullet

wound of entrance in the left side of the face, 5 cm. from the midline at the level of the nasolobial fold, causing a perforation or fracture of the maxilla, first and second cervical vertebrae and laceration of the spinal cord," and for that reason, the photograph had no probative value but was used merely to arouse prejudicial emotion. With this we cannot agree. Here the exhibit was proper not only to give the jury a better understanding of the medical terminology but also to aid them in determining the manner in which the wound was inflicted. Donaldson, being 5 feet 8 inches tall, had contended that the shot was fired by a man at least 6 feet in height, and therefore, on cross-examination of Dorenfest, the defense attorney attempted to show certain discrepancies concerning the infliction of the fatal wound by questioning the witness about the relative positions of both himself and the decedent and about the path of the bullet itself. That this interrogation was somewhat successful is shown by the fact that the trial judge, in passing upon the exhibit's admissibility, commented: "As a matter of fact, counsel, your cross-examination even developed some inconsistency about the range of the bullet." Since much of this testimony was demonstrative and could not be completely expressed by the record, and since the trial judge was in a much better position to ascertain its impact than a court of review, this remark takes on added significance. Furthermore, since the medical testimony as to identity of the decedent and his cause of death was based solely upon an examination conducted at the morgue, and since the police officer who identified the photograph saw the body at the scene of the crime, the exhibit was proper to connect these two identities. It is our opinion that the trial court did not err in admitting the photograph in evidence.

The defendant also contends that prejudicial error resulted from the bringing of evidence as to his morals and other unrelated offenses into the record by means of exhibit and argument to the jury. People's exhibit 2 is a 57-

page unsigned confession which allegedly covers, in great detail, the planning of the robbery in question, the names and addresses of the participants, the commission of the crime itself, defendant's flight to escape prosecution, and his subsequent arrest in New Orleans. In addition, it covers many facts concerning the defendant's personal life as well as his implication in other criminal acts. For example, defendant allegedly answered the following questions concerning a stop he made in Cairo, Illinois, before leaving for New Orleans:

"Q. Who did you see in Cairo?
A. Boy named Vinson.
Q. Is that his first name or last name?
A. His last name.
Q. How long have you known Vinson?
A. About seven or eight months.
Q. Had you met him in Chicago?
A. Yes, sir.
Q. You knew him in Chicago?
A. Yes, sir.
Q. How many stick-ups was he with you?
A. One.
Q. Where was that stick-up?
A. I don't know the name of the street.
Q. Was it before the shooting or after the shooting?
A. After the shooting."

As to his personal life, defendant allegedly made the following statements:

"Q. Are you a married man?
A. I was.
Q. Separated or divorced?
A. Separated.
Q. How long have you been separated?
A. Since first of '53.
Q. You have been separated better than a year, isn't that right?

"A. Yes.

Q. Who were you living with in Chicago?

A. On Adams?

Q. Yes.

A. I was living with Ernestine Webbs.

Q. Is that a girl?

A. Yes."

and also said:

"Q. Where did you and your girl friend go?

A. Went home.

Q. What address?

A. 2105 Adams.

Q. Were you and she living together?

A. Yes, sir.

Q. Did you have a room together?

A. Yes, sir."

In his closing argument, the attorney for the State advised: "* * * when you consider the manner of this defendant you should also consider the fact that this defendant has been convicted of armed robbery. He has already served time in the penitentiary for robbery with a gun. Evidently that is his profession."

Evidence which tends to show that an accused has committed crimes or acts of misconduct which are distinct and entirely unrelated to the one for which he is being tried is both incompetent and prejudicial, (*People* v. *Rivas*, 5 Ill.2d 556; *People* v. *Kosearas*, 408 Ill. 179; *People* v. *Polenik*, 407 Ill. 337; *People* v. *Pazell*, 399 Ill. 462; *People* v. *Mangano*, 375 Ill. 72; *People* v. *Deal*, 357 Ill. 634; *People* v. *Stark*, 324 Ill. 289; *People* v. *Spencer*, 264 Ill. 124; *People* v. *Schultz*, 260 Ill. 35,) and where such irrelevant material is contained in an otherwise competent statement or confession, such material must be deleted before the confession is presented for jury consideration, unless to do so would severely impair the latter's evidential value. (*People* v. *Lane*, 300 Ill. 422; *People* v. *Spencer*, 264 Ill.

124.) Although proof of a prior conviction may be offered to discredit the testimony of the accused, (Ill. Rev. Stat. 1953, chap. 38, par. 734,) this can be done only by the introduction of the prior record itself and not by cross-examination or other testimony, (*People* v. *Kosearas,* 408 Ill. 179; *People* v. *Halkens,* 386 Ill. 167,) and, in no event, may the prosecuting attorney comment upon facts or evidence which would be otherwise inadmissible. *People* v. *Lettrich,* 413 Ill. 172; *People* v. *Black,* 367 Ill. 209; *People* v. *Davis,* 362 Ill. 417; *People* v. *Dabney,* 315 Ill. 320; *People* v. *Hamilton,* 268 Ill. 390.

Whether or not the defendant had been separated from his wife and whether he was engaged in adulterous relations with another woman were completely immaterial to the issues at hand as was the interrogation concerning his criminal activities with Vinson. The latter was especially unwarranted when we consider the form of the question, "How many stick-ups was he with you?" From this phrasing, it could be inferred that Donaldson had been involved in many such crimes even though Vinson was along only on one occasion. Although perhaps inadvertently, this is the exact point emphasized by the assistant State's Attorney when he said "Evidently that is his profession." The defendant admitted of his own accord that he had served a penitentiary sentence for armed robbery and such would have been a proper subject of comment if restricted to his credibility. (Ill. Rev. Stat. 1953, chap. 38, par. 734.) However, it was in no way applicable when considering his habits or customs. Furthermore, the fact that Donaldson had been once convicted of robbery did not warrant the conclusion that such was his "profession." It is our opinion that error resulted from the bringing of such matters into the record.

Nevertheless, the State argues that proof of guilt in the present case is so overwhelming that no other verdict

could have been reached, and even though some error may have intervened, it is not so prejudicial as to warrant reversal upon those grounds. Although such a principle may be sound in certain instances, (*People* v. *Stephens,* 6 Ill.2d 257; *People* v. *Anderson,* 337 Ill. 310; *People* v. *Stark,* 324 Ill. 289; *People* v. *Lewis,* 313 Ill. 312,) it is not applicable to the facts of the present case. Here, the bartender testified that approximately ten customers were in the tavern at the time of the shooting; the police officer who first arrived upon the scene stated that he then counted three customers still present; and the two alleged accomplices had confessed and were awaiting sentence at the time of trial. Yet, not one of these persons was asked to testify, nor was their absence in any way explained. Dorenfest, the only eyewitness who took the stand, was himself somewhat confused as to the events which immediately preceded the shooting and the manner in which the defendant was identified. The foundation necessary for placing the confession in evidence also left something to be desired.

It must be remembered that the jury in the present case not only determined the question of guilt but also passed upon the turpitude of the crime by fixing the punishment itself. Although it is impossible to determine the exact effect that such improper material may have had upon the minds of the jurors, inferences of immorality and prior criminal behavior could quite reasonably be expected to arouse a certain degree of animosity, and in this case, such inferences may have resulted in the refusal of leniency and infliction of the extreme penalty of death. Every defendant, be he a sinner or a saint, has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged. (*People* v. *Black,* 317 Ill. 603; *People* v. *Lane,* 300 Ill. 422.) It is our opinion that Donaldson did not receive the fair and

impartial treatment to which he was entitled, and that justice can best be served by remanding this cause to the lower court for a new trial.

Other errors have been assigned by this defendant but they are of such a nature that it is not probable that they will occur upon retrial, and to elaborate upon such points at this time would serve no useful purpose. For the reasons stated, the judgment of the criminal court of Cook County is reversed, and the cause is remanded to that court for a new trial.

*Reversed and remanded.*