THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GERALD SEPKA *et al.*, Defendants-Appellants.

First District (5th Division)    No. 62575

Opinion filed July 29, 1977.

·Theodore M. Becker, of Becker & Tenenbaum, and R. Eugene Pincham, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Patrick W. O'Brien, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

The defendants, Gerald Sepka and Arthur LaGace, were charged by indictment with deviate sexual assault, two counts of bribery, and two counts of official misconduct. At the close of all of the evidence the prosecution nolle prossed the two counts of official misconduct. The jury found defendants not guilty of deviate sexual assault, but guilty of bribery as charged. (Ill. Rev. Stat. 1973, ch. 38, par. 33—1(d).) Defendants were sentenced to five years probation, with 200 days to be served on periodic imprisonment.

On appeal defendants contend: (1) the prosecution's case was not sufficient to constitute proof of the elements of bribery as a matter of law; (2) even if legally sufficient, they were not proven guilty beyond a reasonable doubt; (3) defendant Sepka's right against self-incrimination was violated by the prosecution eliciting testimony that he remained silent when confronted in a lineup; (4) various improper testimony and evidentiary rulings constituted reversible error; and (5) the cross-examination of defendants concerning a "duty to arrest" deprived them of a fair trial. We reverse and remand. The pertinent evidence necessary to our review follows.

### Elbert Embry

On February 28, 1973, he went to the Auto Show at McCormick Place with his son Herschel, Carol Lumpp, and Jamie Bollin. They went to the show in Elbert's car, a Cadillac Eldorado. While proceeding home from the show they stopped for something to eat at a restaurant on Roosevelt Road. Carol went to purchase some food while Elbert went across the street to a liquor store and bought a half-pint bottle of Seagram's Seven whiskey. Herschel then went to the same store to purchase a bottle of wine for Jamie. Elbert took a drink from his bottle and Jamie drank some wine.

After eating they proceeded west on Roosevelt Road toward Maywood, and soon noticed a squad car following them. Herschel pulled the car into a gas station and the squad car followed. Two police officers exited and asked Herschel for his driver's license, which he could not produce. The officers told Herschel he would have to go to jail, and told both Embrys to get out of the car. One of the officers then reached in the car and produced two brown envelopes and the open liquor bottles. He then informed Elbert that he too would go to jail for having marijuana and open liquor in the car.

The officers then placed the Embrys in the squad car. Both the squad

car and the Cadillac, each driven by one police officer, then proceeded west toward the police station. En route the officers stopped, exited the cars, and conferred. LaGace told Elbert that he was going to seize his car and take him to jail. A conversation with LaGace took place in the squad car as follows:

"Q: Mr. Embry, after he told you he was going to confiscate your car and give you a year, what, if anything, else did he say?

THE WITNESS [Elbert]:

A: He just says: 'what will you do?' and I said: 'I haven't got but ten dollars,' and he says: 'That is no money.'

Q: What?

A: He says that is no money.

Q: And then what, if anything, happened?

A: And my son said: 'What has he got?' And he says: 'Well, I have this.' And then after he gave him that, he says: 'Still no money,' so my son said: 'Dad, give him your watch.'

Q: What, if anything did you do?

A: I gave it to my son and my son gave it to him.

Q: You are referring to LaGace?

A: Right."

At that time Elbert gave the money and watch to LaGace. The officers then searched the trunk of Elbert's car, and LaGace said, "You guys have been cooperative, I am going to let you go." The other officer then stated, "No, Blondie [Carol] is going with me." Carol got into the squad car, and LaGace returned the liquor bottles to the Embrys and let them return to the Cadillac with Jamie.

On March 14, 1973, Elbert attended a lineup out of which he identified LaGace. He later viewed another lineup, consisting of five police officers, but could identify no one.

*Carol Lumpp*

She went to the Auto Show on February 28 with the Embrys and Jamie. On the way home they stopped to get something to eat and bought some liquor. She saw Jamie pour herself a cup of wine.

After they had been stopped by the police car one of the officers, whom she identified as LaGace, went to the driver's side and asked Herschel to get out of the car. She heard LaGace say that the driver smelled like marijuana and ask him for a driver's license. The other officer, whom she identified as Sepka, came to the passenger's side and asked Carol if she knew where the Alto Hotel was, saying that she looked familiar. Carol stated she had never seen either of the defendants before that date. Sepka ordered the passengers out of the Cadillac and LaGace then searched the car. LaGace produced two "reefers" from the back seat along with the

two bottles of liquor. Carol denied that the "reefers" had been in the car at all. LaGace then told Elbert that "with the material we have here that you can go to jail, lose your job, have your car put in tow for a year and bound for $1,000." He then put the Embrys under arrest and placed them in the squad car.

Officer LaGace then told Carol and Jamie to get back into the Cadillac. The two officers conferred, after which Sepka entered the squad car and LaGace entered the Cadillac. The two cars headed south. Shortly thereafter both cars pulled over. The officers conferred, changed cars, and then drove to a mobile school unit where they stopped again. LaGace then searched the trunk of the Cadillac, including Carol's purse which was in the trunk. When the Embrys finally returned to the Cadillac they told her that the officers had taken from them money, a watch, some extra Auto Show tickets, and gift certificates. Herschel then stated that Officer Sepka had said that "Blondie's got to come with us." Carol entered the squad car and drove off with defendants to another location, where they forced her to perform acts of fellatio on them. She memorized defendants' numbers from their hats. Defendants then drove Carol back, leaving her one block from the mobile school from which they had taken her.

Carol reported the incident that night to the Maywood Police, and the next day related certain facts to a Sergeant Hines. She identified Officer LaGace from one lineup and Officer Sepka from another. On three subsequent occasions Carol was arrested for prostitution. She admitted to engaging in prostitution after this incident on about ten occasions, but denied that she previously had been a prostitute.

### Herschel Embry

He had gone to the Auto Show with his father, Carol, and Jamie. On the way back they stopped to purchase something to eat and drink. Herschel purchased some wine for Jamie. In a prior statement (defendants' exhibit 4) he did not state that he had purchased wine.

Herschel then drove the car west on Roosevelt Road. As he approached Independence Boulevard, he noticed a Chicago police car at the curb. The squad car followed and pulled them over. One of the officers requested Herschel's driver's license. When he responded that he did not have one the officer ordered him from the car, and as he obeyed, the officer said, "You smell like marijuana." Herschel saw that the others had also exited the Cadillac.

One of the officers, identified as defendant LaGace, searched the back seat and found the two liquor bottles along with two yellow envelopes. LaGace did not remark what was in the envelopes. Herschel, his father,

and Officer Sepka then entered the squad car while Carol and Jamie entered the Cadillac with Officer LaGace. Sepka told the Embrys that they were in pretty serious trouble, including charges of possession of marijuana, open liquor in the car, and driving without a license.

With the Embry Cadillac in the lead, the two vehicles were driven one block south then turned north, proceeding five or six more blocks before stopping. Defendants exited the cars and conversed, after which they switched cars, with LaGace getting into the squad car. In his prior statement (defendants' exhibit 4), Herschel omitted this stop and rotation of drivers. They then drove the cars to a mobile school. LaGace informed the Embrys that there were several charges against them, and asked Elbert how long he had been on his job. Herschel then testified:

"A. My father told him he had been on the job 27 years.

Q. Then what happened?

A. Well, he told him that 27 years on the job and then with the charges on him now that it didn't look too good for him.

Q. And what, if anything else, did Officer LaGace say at that time, or what, if anything, did your father respond?

A. At that particular time I said, my father—stuff like that gets him kind of nervous, and I asked him, well, I said, 'Isn't there something we can do.'

Q. And what, if anything, did Officer LaGace say to that?

A. Well, you know, at first he didn't say anything.

* * *

A. All right. Well, first of all, when I asked him if there was anything we can do, he didn't answer at first. And then my father told him, he said, 'Honest to God, I don't know how that stuff got in the car. I know it couldn't have been in there because I hadn't drove the car and the car had just been washed and vacuumed, and so—'

Q. Your father was saying this to Officer LaGace?

A. Right.

Q. And then what happened?

A. And then, at first—then again he still didn't say anything and then I told him I had some tickets to the Auto Show.

Q. And what, if anything, did he respond to that?

A. He said, 'Well, let me see them.'

Q. And what did you do?

A. I showed him the tickets.

Q. And then what happened?

A. And then I also told him that—I told him how much money I had.

Q. What did you tell him?

A. I told him that I had about five dollars. In fact, it was five dollars.

Q. All right. What, if anything, did he respond to that?

A. He said, 'That's no money.'

Q. What did you do then? What did you say then?

A. Well, then I told him that I had a gift certificate to Florida.

Q. Had your father said anything concerning money at this time?

A. Well, he said that he had a little money, maybe five dollars.

Q. And what, if anything, did he do with that?

A. Well, he gave it to him.

Q. What did you give to Officer LaGace?

A. Well, I gave him the two tickets to the Auto Show. I gave him a gift certificate, which is four days and three nights in Florida. And I gave him five dollars, and then eventually—well, a few minutes after that I gave him my father's watch. My father took his watch off and he gave it to me, which is $2,000, because I was with my mother when she bought it, and I gave it to him.

Q. And what, if anything, occurred after the watch was given to Officer LaGace—strike that. Let me clarify that.

Where were you at the time the watch was given to Officer LaGace?

A. At the school.

Q. What happened after the watch was given to Officer LaGace?

A. Well, he got out of the car and he and his partner met between the cars again."

Officer LaGace then returned to the squad car and said he was going to let them go. He returned the liquor bottles to the Embrys and told them to return to the Cadillac.

Herschel returned to the Cadillac. He told Carol that the officers wanted her to go with them and that if they tried anything funny to tell them she was sick and to attempt to get their badge numbers. When the squad car left with Carol, the Embrys did not follow, although the officers had not instructed them not to do so.

Herschel told Sergeant Hines about the incident on March 7. He failed to identify certain photographs of the two officers involved and instead selected a photo of another officer.

*LaGace and Sepka*

They admitted that they had stopped the Embry car and then released the occupants. Both denied accepting anything from the Embrys or committing a sexual act with Carol. LaGace had been a police officer for six years, and Sepka for four years. They were assigned as partners to the

Fillmore District in February of 1973. On the day in question they were proceeding east on Roosevelt Road and noticed a westbound Cadillac on which the tail light was not operating. They made a U-turn with the squad car and curbed the Cadillac. Defendants exited the squad car. LaGace explained the violation to Herschel who answered that he had a driver's license. At this time LaGace observed an open liquor bottle in the car, instructed everyone to leave the car, and then searched the interior of the car.

Defendants each stated that LaGace removed the wine bottle from the front seat and handed it to Sepka. LaGace alleged that this bottle might have contained "a couple of drops" and Sepka alleged that the bottle was empty. LaGace searched the rear seat, recovering an empty whiskey bottle and two empty manila envelopes, which smelled of marijuana. Carol and Jamie then started screaming and swearing at the officers, which caused a crowd to gather, so defendants decided to complete the investigation at the station. Sepka took the Embrys in the squad car, and LaGace drove Carol and Jamie in the Cadillac.

Sepka testified that the following occurred when the Embrys asked if they were being arrested:

"A. I said, 'You are not being arrested, and I am not charging you with anything.' I said that this is what we have. I said, 'There is a tail light out on your Cadillac. There is a license plate-light out on your Cadillac. I have these liquor bottles, and these two bags, or two manila envelopes my partner said at one time contained marijuana.'

Q. And what, if anything, did Elbert or Hershel Embry say to you?

A. Hershel Embry then said that he did not know that the lights were out on the Cadillac, and he would get them fixed the next day or as soon as possible. Elbert Embry, the older man, said that he was on his job for 27 years and did not want to be arrested.

Q. After that, what, if anything, occurred?

A. I asked—I then asked them, I said—I told them that we had—didn't have any charges on them, and I said 'What's in the trunk of your automobile?' I said, 'Will you let us search it, and if we find anything in your trunk, then we will place you under arrest for what we find in the trunk of your automobile.'

Q. What did you do then?

A. At this time, I put the spot light of the squad onto the Cadillac, which my partner was driving.

Q. What happened?

A. He stopped. I stopped the squad car. We both got out. We were in the middle of the two cars, and I explained—I told him

that we didn't have anything on these people. They [*sic*] guy was on the job for 27 years, and Hershel said that he was going to get the lights fixed at the first opportunity, and that we could—we had their permission to search the trunk and if we found anything in their trunk, then we would lock them up for what we found in the trunk."

Defendants then searched the trunk of the Cadillac, finding two purses. According to LaGace, Sepka stated that purses locked in a trunk indicated that the women were prostitutes.

Defendants alleged that they entered the squad car and Sepka had a conversation with Herschel in which he admitted that Carol was a prostitute, working for him. He denied that they worked the Fillmore District, however.

Officer Sepka believed that Carol was a prostitute known by the name of Ann Bloomgardner. Despite Herschel's denial of this he stated to LaGace that they should take her in to be checked out with the vice squad.

The Embrys exited the squad car and Carol entered it. She admitted being a prostitute, but not Ann Bloomgardner. Defendants signaled the Embrys to follow them to the station, which the Embrys did not do. While en route defendants stated that Carol claimed her father was a policeman, Officer Robert Lumpp. Defendants then decided to let her go, partly because of her story about her father being a policeman and partly because Sepka, after a closer examination, did not think she was the woman he knew as Ann Bloomgardner. They then returned Carol to where they had left the Cadillac, warning her not to ever return and "work" their district.

Defendants stated that they returned Carol at approximately 7:45 p.m., and at 7:50 p.m. acknowledged a radio message directing them to 2738 West Arthington, where they did not arrive until about 8:20 p.m. This address was only 8-9 blocks from the officers' location; however, they stated that in the interim they proceeded to a street disturbance.

On March 12, 1973, Officer Sepka gave a statement to Sergeant Hines and others, and did not mention the name of Officer Lumpp. Defendants did not want to get Officer Lumpp involved or have anything put into his file about his daughter being a prostitute. However, they had not attempted to confirm Carol's story.

LaGace testified that police procedures and orders permitted him discretion in arrest even when he observed violations. Defendants' exhibit 5, a document containing the police operating policies, reads in part, as to traffic enforcement, that:

"Police officers are expected to exercise discretion. It is proper to

warn a violator when, in the opinion of the officer, the violation was minor and unintentional, and when conditions indicate that our end purposes are accomplished as effectively as if a summons were issued."

and generally, that:

"The police must necessarily exercise the discretion in the enforcement of the laws because of the limited resources available to them, because of the inherent ambiguities of some laws, and because there are some more effective ways of accomplishing the purpose of the law."

The same police orders, however, directed the beat officer's attention toward prevention of prostitution and liquor violations which might foster crimes of an aggressive nature.

OPINION

Defendant Sepka initially contends that it was error for the prosecution to elicit testimony that he remained silent when confronted in a lineup. During cross-examination of defendant the following exchange occurred:

"Q. Well, were certain witnesses brought to you in front of you and there was a conversation?

A. Yes, there was.

Q. Well, did he [Sergeant Hines] ask any questions of you in front of these other witnesses?

A. Not that I can remember, no.

Q. Did the persons that confronted you, such as Carol Lumpp, Hershel Embry and Jamie Bollin speak in your presence?

A. Yes, they did.

Q. Stated to you and to your partner what you supposedly had done on that date in question, meaning February 28?

A. Yes, yes, they did.

Q. And did you talk back?

MR. McGEE [defense counsel]: Objection, your Honor.

THE COURT: He may answer, if he did.

THE WITNESS: A. No, I did not.

MR. KLAPMAN [prosecutor]: Q. Did anybody talk at that time?

A. I believe my partner said a few words.

Q. And you just stood mute, then, so that the first time you ever talked—

MR. McGEE: Objection, objection.

THE COURT: Just a minute. Standing mute may be a different thing. You want a sidebar on this?"

During the sidebar the court sustained defendant's objection; however, it

did not make its ruling in front of the jury. No corrective instructions were given to the jury to ignore the previous testimony concerning defendant's silence.

■■ The United States Supreme Court recently stated in *United States v. Hale* (1975), 422 U.S. 171, 176, 45 L. Ed. 2d 99, 104-05, 95 S. Ct. 2133, 2136:

> "In most circumstances silence is so ambiguous that it is of little probative force. For example, silence is commonly thought to lack probative value on the question of whether a person has expressed tacit agreement or disagreement with contemporaneous statements of others. See 4 Wigmore §1071. Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation. Failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question. 3A Wigmore §1042."

Thus, the silence at the time of arrest of an accused who has been given the *Miranda* warnings cannot be used for impeachment purposes. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240; *United States v. Hale.*) Under such circumstances, "his failure to offer an explanation * * * can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication." (*United States v. Hale*, 422 U.S. 171, 177, 45 L. Ed. 2d 99, 105, 95 S. Ct. 2133, 2137.) Similarly, it is error to introduce evidence of an accused's silence when confronted in a lineup. *People v. Owens* (1975), 32 Ill. App. 3d 893, 337 N.E.2d 60.

■■ While the record is unclear whether Officer Sepka had been arrested and advised of his rights prior to his participation in the lineup, we think it is clear that attention had focused on Sepka as a potential defendant prior to such participation. (See *United States v. Hale; Grunewald v. United States* (1957), 353 U.S. 391, 1 L. Ed. 2d 931, 77 S. Ct. 963.) Carol had telephoned Maywood Police Officer Stenson on the night of the occurrence inquiring how to report the incident. The next day she telephoned Police Sergeant Hines reporting the incident. Herschel related the incident to his mother who informed Maywood Police Officer Jenkins. Complainants had written down defendants' badge numbers following the incident. On March 8 complainants met with Sergeant Hines to give statements and view a lineup. Carol identified both defendants, while Elbert could only identify defendant LaGace. We cannot say that defendant's silence under such circumstances, particularly in the setting of a lineup, was unambiguous. It could merely represent the exercise of

an existing right of which defendant was well aware. (*Cf. People v. Lewerenz* (1962), 24 Ill. 2d 295, 181 N.E.2d 99; *People v. Owens; People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18.) Therefore, it was error to allow such testimony into evidence.

We do not agree with the State's contention that defendant Sepka has failed to preserve this issue for review. Defense counsel's timely objection to the testimony was overruled. The question before this court, therefore, is whether such error, in the circumstances of this case, can be considered harmless.

Violation of a constitutional right does not require reversal where that error is harmless. (*Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.) However, in order for an error involving the denial of a Federal constitutional right to be held harmless in a State criminal case, the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. (*People v. Brady* (1973), 14 Ill. App. 3d 830, 303 N.E.2d 528; *People v. Garnes* (1973), 12 Ill. App. 3d 210, 298 N.E.2d 399.) We are not so convinced in the case at bar.

■■ While the testimony concerning defendant's silence was not emphasized to the jury, we note that, unlike *People v. Garnes*, the story offered by defendant was not far-fetched or unreasonable. Sepka did not deny having contact with the complainants on February 28. The testimony concerning his silence might well have played a role in the jury's choice to believe complainants' version of the incident over defendant's version. While we do not herein conclude that complainants' testimony, along with any other evidence for the State, would not be sufficient to convict defendant beyond a reasonable doubt, we are unable to say beyond a reasonable doubt that the evidence of defendant's silence did not contribute to the instant verdict. Thus, we cannot say that this error was harmless, especially when considered in conjunction with the other trial errors which are noted in the subsequent portions of our opinion.

Defendants contend secondly that various improper testimony and evidentiary rulings constituted reversible error. While we believe that the individual errors alleged, by themselves, would not ordinarily justify remanding this cause for a new trial, we find that the cumulative effect of such errors was indeed prejudicial. The instant case is one wherein the guilt of the accused is not manifest, but is dependent upon the degree of credibility accorded by the trier of fact to the accused's testimony as opposed to the testimony for the State. As such we must guard carefully against improper factors influencing the jury's decision concerning such credibility. In the instant case, many trial errors could have played a role

in such a decision. When all are considered together, we cannot say that the jury was not influenced by such errors, and thus find them, in total, to be prejudicial.

Initially we find that the court erred in allowing the State to elicit testimony concerning defendant LaGace's obtaining two police reports (defendants' exhibits 1 and 2), which related to prostitution arrests of Carol. Defendants sought to impeach Carol in that the birth dates in the reports differed from the date Carol testified she had given when arrested.

During cross-examination of LaGace the State adopted a line of questioning which inferred that he had acted impermissibly or illegally in obtaining such reports and giving them to his lawyers. The pertinent exchanges upon cross-examination were as follows:

"Q. And those [arrest] reports by police regulations you are not to give them out to anyone, are you?

A. Which reports?

Q. Your police reports, reports of persons arrested containing the synopsis.

A. Strictly confidential.

Q. Strictly confidential and you are not to give them out to anyone, are you?

A. I don't give them out to anyone.

Q. Well, there is a regulation to that effect, is there not?

A. MR. McGEE [defense counsel]: Objection, what has this got to do—

THE COURT. I have no idea. He opened it up. I don't know where he is going. The officer may answer, if he knows.

THE WITNESS [LaGace]:

A. Repeat the question.

MR. BUFFARDI [prosecutor]:

Q. There is a regulation to that effect, is there not?

A. I believe there is.

Q. And you never have given any of your police reports away, especially to a Defense Attorney, have you?

MR. McGEE: Objection. What has this got to do—

* * *

THE COURT: I don't know, Mr. McGee. I can shut him off. There is a wide latitude on cross examination.

* * *

MR. BUFFARDI: By Defense exhibit number—strike that—1 and 2 are the reports I am referring to. These are the reports of Officer Corliss, are they not?

THE WITNESS [LaGace]:

A. Yes, Robert Corliss, yes.

Q. And they are in the possession of the Defense at this time, are they not?

A. Yes, I obtained them myself.

Q. You obtained them?

A. Yes, I did.

Q. And who did you obtain them from?

A. Room 209, Second Floor, Record Division, Police Records.

Q. When did you obtain them?

A. I do not remember the dates. I went there myself and picked them up.

Q. Was it before or after you were indicted?

A. Before or after I was indicted?

Q. After you were indicted?

A. It was after I was indicted.

Q. After you were indicted?

A. Yes.

Q. And that would also be after you were suspended, would it not?

A. That is correct.

Q. And after you were suspended and indicted you went to the Police Headquarters and removed this from—

A. I was given the reports. I did not remove them.

MR. MALONEY [defense counsel]: Objection to the form of the question. These are public records. Anybody can get them.

MR. BUFFARDI: They are not public records and no one can get them.

MR. MALONEY: Any lawyer can get them.

MR. BUFFARDI: Not legally."

Defense counsel requested a sidebar conference, during which he made a motion for mistrial and, in the alternative, a motion that any testimony concerning how the reports were obtained be stricken and the jury be instructed to disregard such testimony. The court denied the motion for mistrial, allowing the prosecution to continue its inquiry without instruction to the jury.

■■ Evidence tending to show unrelated misconduct of the accused is improper. (*People v. Donaldson* (1956), 8 Ill. 2d 510, 134 N.E.2d 776; *People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.) In the instant case the prosecutor's inquiry inferred that LaGace illegally obtained the reports and turned them over to defense counsel. Such inferences were improper.

The State contends not only that defendant has waived certain of his objections to such testimony, but also that such testimony was properly admitted as relevant to the case at bar. We disagree.

■■ In reviewing the record we note that defense counsel twice objected generally to this line of inquiry in a proper and timely fashion. The court effectively overruled such objections, announcing that it would not limit the scope of the cross-examination. In addition, defense counsel later moved to strike such testimony from the record, specifically indicating to the court the prejudice suffered. The court found such testimony relevant in indicating that if "he stole them," that "goes to impeachment and it is credibility." Thus, the court did not strike the testimony. Under such circumstances we feel defendant has done all that is necessary to preserve this issue for review. See *People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.

The State also argues that the prosecution's inquiry was relevant to determine the chain of possession of the reports before reaching the defense, in light of Carol's claim that the reports were altered. We have reviewed the record and find no such claim of alteration. Carol admitted the inconsistent birth dates, contending that the arresting officer merely wrote down the wrong year.

We also note that no challenge as to the authenticity or chain of possession of these reports was raised at the trial level. If the prosecution was truly concerned with such issues it should have challenged the defense to lay a more proper foundation for use of such evidence. Lastly, we note that the prosecution's inquiry, even if justified, went beyond what was needed to establish a chain of custody. The inference of illegal conduct by defendant was clearly there for the jury to draw. Thus, we conclude that the trial court erred in allowing such testimony to remain in evidence. The possible effect of such testimony on the jury's determination of credibility could have acted to deny defendants a fair trial. *Cf. People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Black* (1925), 317 Ill. 603, 148 N.E. 281.

The trial court also erred in allowing Lieutenant Harold Brown of the Chicago Police Department to testify as to his opinion of proper police conduct concerning the duty to arrest. Lieutenant Brown testified as a prosecution witness concerning the assignments of defendants on the day of the incident. In addition, the following exchange occurred:

"MR. KLAPMAN [prosecutor]: As a policeman, somebody offered items to you—excuse me. I will withdraw the whole thing and ask a hypothetical.

Lieutenant, if you stopped a car and you were going to charge a person with a crime, such as possession of marijuana and they offered to you money and they offered to you a watch and they offered to you tickets to the Auto Show and for a trip to Florida, what, if anything, would you do under this hypothetical?

MR. McGEE [defense counsel]: Judge, Objection. This isn't a question to an expert, of expertise at all.

THE COURT: I have to disagree. He can answer what he would do.

MR. McGEE: What difference does it make what the Lieutenant would do?

THE COURT: It may be something the jury may think it is important. He may answer.

THE WITNESS: I would place them under arrest for possible charges of bribery, either attempted bribery."

■■ The State concedes that such testimony by Brown was improper. Expert opinion testimony is admissible where there is a need for the experience possessed by the witness to assist the court and jury in determining an issue. (*People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92, *cert. denied*, 419 U.S. 1111, 42 L. Ed. 2d 808, 95 S. Ct. 786 (1975).) However, a witness may not testify as to the legal effect of facts already in evidence. (*People v. Rosenfeld* (1962), 25 Ill. 2d 473, 185 N.E.2d 236.) In the instant case, Brown's testimony constituted improper testimony as to the legal effect of the previous prosecution evidence.

Not all improper opinion testimony is necessarily prejudicial, however, especially where the conclusion or testimony adduced is an obvious one. (See *People v. Sanchez* (1973), 11 Ill. App. 3d 1079, 297 N.E.2d 230.) Lieutenant Brown's testimony in this case, however, approaches infringement of the jury's province in determining the ultimate issue. As a figure of police authority, he is informing the jurors that should they choose to believe that portion of the prosecution's case going toward the offering of a bribe, they *must* then assume the bribe was accepted. Otherwise, if it had not been accepted, the defendants, as police officers, would have been obligated to arrest the complaining witnesses for attempted bribery. Clearly, no such arrest was ever made. The effect of such an improper inference concerning an *obligation* to arrest, while not serious in itself, must be considered cumulatively with the other errors in the instant case.

■■ A third factor of possible prejudice to defendants was the prosecution's question to defendant LaGace regarding a reprimand of LaGace by the police department on an unrelated matter. In the re-cross-examination of defendant the prosecution asked the following question:

"Q. Calling your attention to July 31, 1972, were you reprimanded by the Chicago Police Department for failure to submit an alcoholic influence report or alcoholic field report to your watch commander?"

After objection and a sidebar, the court sustained the objection and instructed the jury:

"THE COURT: I will direct the officer not to answer that question, and I will ask the jury to dismiss from their mind, if they possibly can, the question that was just asked."

The State concedes the impropriety of the question. Evidence tending to show that an accused committed acts of misconduct which are unrelated to the charged offense is improper. (*People v. Donaldson* (1956), 8 Ill. 2d 510, 134 N.E.2d 776; *People v. Curry* (1975), 25 Ill. App. 3d 637, 323 N.E.2d 778.) Such error can be cured, however, if an objection is sustained and the jury instructed to disregard the question. See *People v. King* (1963), 29 Ill. 2d 150, 193 N.E.2d 790; *People v. Parks* (1971), 133 Ill. App. 2d 348, 273 N.E.2d 162.

In the instant case, we find that the trial court's attempt to cure was, at best, ambiguous. The phraseology, "if they possibly can," chosen by the court could leave the jurors with the idea that they did not have to disregard the question; *e.g.*, that the court's instruction was permissive rather than compulsive in nature. Thus, the inference that defendant LaGace was not a good policeman, and that he had been reprimanded in the past, was still there for the jury to consider. This was improper.

We find fourthly that the rebuttal testimony of Officer Ralph Stiglich was improper, and thus could have lent itself to prejudice of defendants' case before the jury.

Stiglich, a Chicago police officer with record-keeping duties, testified that he checked the "Alpha Files," which includes the names of everyone arrested by the Chicago police, even though those people are released without charging, and found no one listed under the name of Ann Bloomgardner. The State argues that such testimony was proper. Defendants had testified that the reason they were taking Carol to the police station was to check whether she was a prostitute they knew as Ann Bloomgardner. Thus, the State contends that the lack of an arrest record for such a person tends to contradict defendants' story that such a person existed. We disagree.

Rebuttal evidence is proper where it explains, repels, contradicts, or disproves evidence produced by the accused. (*People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683.) Upon review of the instant record, we find that the testimony offered by Stiglich did not truly rebut any of the defendants' evidence, and thus only served to improperly impeach the defendants' credibility. *Cf. People v. Karmazirıs* (1967), 80 Ill. App. 2d 322, 224 N.E.2d 287.

Neither of the defendants ever stated that a prostitute named Ann Bloomgardner had been arrested, or that if arrested she had given her name as Bloomgardner on an official arrest report. At best, they merely indicated that they had seen a woman who they knew by the name of Bloomgardner. They did not say that she was known by this name throughout the department. Similarly, they only indicated that they had seen this woman around or at the station. It is not evident that the alleged

Ann Bloomgardner was under arrest when defendants had seen her. Indeed, defendant Sepka stated that this woman had not been under arrest when he saw her at the station. Thus, the fact that such a name was not found in the arrest records does not truly rebut defendants' testimony. The rebuttal testimony was therefore improper. See *People v. Karmazinas.*

■■ We have little doubt, however, that the Stiglich testimony gives an outward impression of contradicting defendants' testimony. As such it may well have improperly impeached defendants' credibility in the eyes of the jury, thus ultimately influencing the jury's choice to believe, at least in part, complainants' version rather than defendants'. Clearly, the admission of such erroneous testimony cannot be deemed harmless in a case like the instant one, wherein the decision of guilt rests largely on the jury's choice as to the credibility of the witnesses for the defense as opposed to the witnesses for the State.

In light of the foregoing errors we believe that justice demands that defendants be afforded a new trial. We therefore address ourselves to the other issues raised on appeal which might recur upon remandment of this cause.

■■ Defendants contend that the court erred in allowing into evidence the hearsay testimony of Carol that the Embrys told her defendants took money from them. We disagree. As noted by the State, such testimony was not within the hearsay rule and needs no exception to be properly admitted. The hearsay rule is inapplicable if the same evidence contained in the hearsay testimony has been competently testified to by the out-of-court asserter himself. (*People v. Breitweiser* (1976), 38 Ill. App. 3d 1066, 349 N.E.2d 454; *People v. Hoffmann* (1970), 124 Ill. App. 2d 192, 260 N.E.2d 351.) In the instant case both Embrys testified that defendants took money from them, and both were cross-examined. Therefore, the foregoing testimony of Carol was not subject to the hearsay rule.

■■ In addition, we agree with the State that Carol's testimony would be admissible under the spontaneous declaration exception to the hearsay rule. An out-of-court statement is admissible as a spontaneous declaration where the occurrence is sufficiently startling, no time exists for fabrication, and the statement relates to the circumstances of the occurrence. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) In the instant case the Embrys' car had been pulled over and both Embrys had been removed and taken into the police car. Upon returning to their own automobile they told Carol that the defendants had taken money from them. Almost no time elapsed between the event and the subsequent statements. Therefore, Carol's testimony was properly admitted.

Defendants also contend that the prosecution's improper questions and

inferences concerning a duty to arrest complainants deprived them of a fair trial. Again we disagree, and find that the prosecution's inquiries were well within the scope of proper cross-examination.

■■ It is proper to cross-examine the accused about details of essential facts referred to in his examination in chief. (*People v. Strutynski* (1937), 367 Ill. 551, 12 N.E.2d 628.) In the case at bar, defendant LaGace testified that police department rules gave them discretion in arresting, even when observing violations. We have reviewed the record in detail and find that the prosecution's cross-examination in this regard merely went to the scope and extent of that discretion to arrest. In addition, the prosecution went on to cross-examine defendants concerning why they chose not to charge complainants in the instant case with some violation of the law. The challenged questions in this regard did not establish a duty to arrest, but rather inferred that if defendants' version of the incident were true, it would be unlikely that they would release the complainants without arresting them, despite the discretion which an officer must use in making any arrest. Such an inference could properly be considered by the jury.

Defendants also contend that the evidence was insufficient to prove the elements of bribery or to prove guilt beyond a reasonable doubt. Upon careful examination of the record it is our considered opinion that the convictions be reversed and the cause remanded for a new trial. Accordingly, it would be inappropriate and we therefore express no opinion as to guilt nor analyze the evidence. *People v. Monaghan* (1976), 40 Ill. App. 3d 322, 323, 352 N.E.2d 295, 296.

For the reasons stated, the judgment of the circuit court of Cook County is reversed, and this cause remanded for a new trial not inconsistent with this opinion.

Reversed and remanded.

SULLIVAN, P. J., and WILSON, J., concur.