THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WILLIAM SPARKMAN *et al.*, Defendants-Appellants.

First District (5th Division)    No. 77-1279

Opinion filed January 12, 1979.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ellen Dienes, and Alan D. Lyons, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendants were convicted of armed robbery. On appeal, they contend (1) that they were denied a fair trial because the trial court (a) failed to narrow the scope of cross-examination of defense witnesses and (b) improperly admitted certain opinion testimony; and (2) that they were not proved guilty beyond a reasonable doubt.

At about 7:30 p.m. on a February evening, Ava Davis and her two daughters, aged 4 and 7, arrived at the apartment building where they

resided. As Ava checked her mailbox located in the ground floor lobby of the building, she saw two men whom she later identified as defendants walking backwards toward her. They turned in her direction, and she observed them for five seconds before they pulled scarves over their faces and announced a holdup. William, who had been seen by Ava around the area on four or five prior occasions, stood facing her while pointing a gun at her head, and Robert, standing a few feet to the rear of William, held a knife to the throat of her four-year-old daughter. In response to William's demand, Ava gave him her bag containing her wallet, a cosmetic bag, meat, brandy and $7, which he handed to Robert. Robert, in taking the bag, released the child and, when he did so, the scarf fell and exposed his face. At the same time, the child began to run from the building, and when William turned to see what was transpiring behind him, Ava pulled the scarf from his face. After a six- or seven-second interval, defendants ran from the building, followed by Ava. Reaching the exit, Ava and the child fled to the left while defendants turned right and ran into an adjacent building.

Ava located her boyfriend, Charles Kemp, a Chicago police officer, and when she told him what had happened he accompanied her to the building entered by defendants but they found no one in the stairwell, and an official call was then made to the police.

At about 8:45 that evening four Chicago policemen went to the same building in search of Anthony Sparkman, defendants' brother, to arrest him for three unrelated robberies. When they knocked at the door of apartment 301 and announced their office, they heard the sound of three different voices and the scuffling of feet within. After approximately 30 seconds, two of the officers left the building and positioned themselves outside at the building's southeast corner to observe the windows of apartment 301. While there, they saw a smoldering purse fly out of the south window of the apartment. They lost sight of the east window when they were retrieving the purse.

Meanwhile, the two officers who had remained stationed at the apartment door were admitted after 5 to 10 minutes by Hollis Sullivan, a friend of defendants' mother who leased the apartment. The officers found no one else in the apartment; but, in the meantime, the other two officers had discovered that the purse contained documents indicating it was owned by Ava Davis. Via radio communication, they learned that Ava had earlier reported a robbery. Responding to that radio call, Officer Kemp went to apartment 301, where he identified Ava's purse as well as the brandy and meat he had purchased for her earlier that evening. Sullivan then told the police that Anthony and Robert had been in the apartment but had jumped out of the window when the officers came to the door.

Shortly after 10 p.m., the police received a telephone call from a man identifying himself as Robert Sparkman, and officers were dispatched to apartment 301, where Robert was apprehended. At 12:45 a.m. Ava viewed a lineup composed of six men, including Robert, whom she identified as one of her assailants. Thereafter, police evidence technicians, while photographing the interior of the apartment, found Anthony sleeping in the bedroom and placed him under arrest for the unrelated robberies. At about 2 a.m. Ava viewed Anthony in a one-man show up but said that he was not one of the offenders. Later, William was arrested in the apartment of a friend, Maria Lewis, who resided down the hall from apartment 301 and, at about 3 a.m. in another show up, Ava identified William as the man who had held her at gunpoint and robbed her. At approximately 4 a.m., Lewis went to the station and told police that she had observed the incident in question and that Anthony and one Gregory McNulty were the offenders. The police were unsuccessful in their attempts to locate McNulty.

At trial, Lewis testified that at approximately 7:45 p.m. on the night in question she heard sounds from outside and went to her kitchen window. She observed a woman, two children and two men run from the building adjacent to hers; however, she was unable to identify any of these people at that time. She then went out on her porch and saw two men known to her to be Anthony Sparkman and McNulty ascend the stairway located near apartment 301 and, when they reached the third floor, one of them dropped a knife. She also saw that Anthony was carrying a tan purse when they entered apartment 301.

Anthony testified that he and McNulty robbed Ava, using a knife but not a gun, and that after running from the scene he saw Lewis on the first floor of her building. He and McNulty then went upstairs to apartment 301 in the same building, where they divided the proceeds. When the police arrived at 9 p.m., he set fire to the purse and threw it out of the bathroom window. After about 10 or 15 minutes, the police left without gaining entry to the apartment.

Sullivan testified that when he spoke to the officers he told them that he had not thrown the burning bag from the window; that Anthony and McNulty had been in the apartment since 8:30 that evening and that they must have exited the apartment by jumping from the window, as there was only one door.

Pearline Digby testified that on the night in question William arrived at her home at 7 p.m. to visit her daughter, Aretha, and that he remained until she left the house at 9 o'clock. Aretha testified that William did not leave the Digby home until 9:50 p.m.

Defendants' mother testified that she drove Robert to the home of his great-uncle, Early Hemphill, at 5 p.m. on the date in question to inquire

about a possible job opportunity; that Anthony had a pair of dark-rimmed prescription glasses but that Robert did not wear prescription glasses. (In her description to police, Ava indicated that Robert wore dark-rimmed glasses with clear lenses.) Mrs. Hemphill then testified that Robert visited with her and her husband from 5 to 9:30 p.m. on the evening of the robbery.

OPINION

Defendants first contend that they were denied a fair trial because the trial court refused to restrict the cross-examination of certain defense witnesses which was calculated to harass and humiliate them, and because the opinion of a police officer regarding the veracity of a defense witness was erroneously admitted. We disagree.

■■ Cross-examination, which is designed to humiliate and harass the witness, is irrelevant to the issues of the case and, accordingly, is properly excluded. (*People v. Phillips* (1970), 129 Ill. App. 2d 455, 263 N.E.2d 353.) However, the latitude permitted in the cross-examination is within the sound discretion of the trial court and only in a case of clear abuse which manifestly prejudices the accused will a court of review interfere. *People v. Castillo* (1976), 40 Ill. App. 3d 413, 352 N.E.2d 340; *People v. Jones* (1975), 34 Ill. App. 3d 103, 339 N.E.2d 485, *cert. denied* (1976), 426 U.S. 953, 49 L. Ed. 2d 1192, 96 S. Ct. 3179.

■ Here, over defense objection, Anthony, who had confessed to the offense, was asked how he went about selling the food stamps which he said had been taken from Ava's purse. Again, over defense objection, Mrs. Digby, who had provided a 7 to 9 p.m. alibi for William, was asked if, when she changed clothes at 7:30 after completing work as a hairdresser in her basement shop, she also washed her hands. On direct examination she had testified that while William visited with her daughter, she read the Bible and, on cross-examination, the prosecutor asked which verses she had read. Although these questions appear to have no relevance and were improper, they were not such that they caused prejudice and we see no abuse of discretion in allowing them to be asked and answered.

■■■ Turning to the question of the admission of opinion testimony, it has been said:

"As a general rule, testimony as to the witness' opinion is not admissible into evidence. The testimony of the witness must be confined to statements of fact of which the witness has personal knowledge. [Citation.] In some instances, of course, nonexpert opinion evidence is allowed. Nevertheless, a witness may not state his opinion or conclusion concerning an out-of-court statement, but is required to recite the statement as nearly as possible.

[Citations.]" (*People v. Linkogle* (1977), 54 Ill. App. 3d 830, 833, 368 N.E.2d 1075, 1078. Accord, *People v. Rosenbaum* (1921), 299 Ill. 93, 132 N.E.2d 433; *People v. Sepka* (1977), 51 Ill. App. 3d 244, 367 N.E.2d 138.)

Although a prosecutor may not vouch for the credibility of the State's witnesses (*People v. Martin* (1975), 29 Ill. App. 3d 825, 331 N.E.2d 311; *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 289 N.E.2d 256), a witness may testify to his opinion of another witness' reputation for truth and veracity in the community if the facts supporting such opinion are within his personal knowledge (3A Wigmore, Evidence §922 (Chadbourn rev. 1970)). Moreover, even where opinion testimony is improperly admitted, such admission is not necessarily prejudicial where the conclusion adduced is an obvious one. See *People v. Sanchez* (1973), 11 Ill. App. 3d 1079, 297 N.E.2d 230.

Here, on direct examination, the police officer who had taken Ms. Lewis' statement testified that she first said she observed the incident in question from the first floor of her building while disposing of trash, and then stated that she saw the robbery from her third-floor apartment. On cross-examination, the officer answered that he did not make out a report concerning her statements and, when he was asked on redirect why he did not do so, he answered (over objection), "Too many conflicting stories and she was unbelievable at the time."

During oral argument before this court, defendants admitted that the question was properly posed as it could have elicited a variety of factual responses, but they argued that as the officer included in his answer an uncalled-for opinion of Lewis' veracity, the failure of the court to *sua sponte* strike the response was plain error. Plain errors are those which in the ordinary sense have not been preserved for review through the failure of the appellant to question their occurrence in the trial court but which, nonetheless, may be noticed by a court of review if their effect was to compromise the substantial rights of the accused. (Ill. Rev. Stat. 1977, ch. 110A, par. 615(a); *People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) We do not believe, however, that the response in question constituted plain error.

Although the officer's expression of an opinion was improper because no foundation was laid to establish his knowledge of Lewis' reputation for truth and veracity, the officer had previously testified to the inconsistencies in her statements which were the basis of his opinion. In addition, prior to the officer's testimony, the jury was apprised of other inconsistencies in her testimony. She had, for example, told the police and testified at a preliminary hearing that she had observed the robbery, but at trial admitted that she had not seen it. Moreover, during the course of her testimony at trial, she stated that the men expended 5 to 10 minutes in

running from the one building until they arrived at the third floor of her building, but she also indicated that the time period might have been considerably shorter. Under the circumstances of the case at bar, it appears to us that in voicing his opinion the officer added little more than what was otherwise disclosed in the record, and that his conclusion was an obvious one. *Sanchez.*

■ Moreover, it appears that Ms. Lewis was not the crucial witness suggested by defendants, as she testified that she did not recognize the men she saw running between the buildings and that she lost sight of these men for an undisclosed period of time. Her testimony that she later saw Anthony and McNulty enter her building carrying a knife and a purse supports Anthony's testimony only to the extent that he and McNulty were in the area. Even had the purse been the one taken from Ava, it could have been passed to Anthony by defendants at the conclusion of the offense. In view of the foregoing, we cannot say that substantial rights of the accused were affected by the officer's response. Accordingly, we conclude that defendants were not denied a fair trial by the court's failure to strike *sua sponte* the opinion of the officer.

Defendants next contend that they were not proved guilty of armed robbery beyond a reasonable doubt. It is their position that the evidence fails to support their conviction because the trial court expressed doubts of their guilt; the complaining witness had an insufficient opportunity to observe her assailants; a discrepancy existed between her description of the taller assailant and Robert's actual appearance; Anthony had exculpated them by confessing to the commission of the crime; and their alibis were not impeached. Again, we disagree.

■ In Illinois, the testimony of a single witness, if positive and credible, is sufficient to support a conviction although contradicted by the accused. (*People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; *People v. Miller* (1971), 2 Ill. App. 3d 206, 276 N.E.2d 395.) An identification is strengthened to the extent of any prior acquaintance with defendant. (*People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 329 N.E.2d 262.) While the unimpeached testimony of an alibi may not be disregarded (*People v. Gardner* (1966), 35 Ill. 2d 564, 221 N.E.2d 232; *People v. McGee* (1961), 21 Ill. 2d 440, 173 N.E.2d 434; *People v. Hister* (1974), 20 Ill. App. 3d 933, 314 N.E.2d 562, *aff'd* (1975), 60 Ill. 2d 567, 328 N.E.2d 531), the trier of fact is under no obligation to believe alibi testimony even if given by a greater number of witnesses (*People v. Jackson* (1973), 54 Ill. 2d 143, 295 N.E.2d 462). A natural interest in the accused's well-being may affect the weight given to a witness' testimony, and while ordinarily judicial confessions are accorded high probative value, a confession is not conclusive of every statement made therein and must be weighed in the same manner as other evidence (*People v. Horobecki* (1977), 48 Ill. App. 3d 598, 363 N.E.2d 1).

This is particularly true where the facts and circumstances indicate that the confession may "have been motivated by self interest or family loyalty as by 'the strongest sense of guilt.' " *People v. Uselding* (1967), 85 Ill. App. 2d 323, 325, 230 N.E.2d 1, 2.

*People v. Horton* (1975), 28 Ill. App. 3d 174, 328 N.E.2d 72 (abstract), is strikingly similar to the case at bar. There, shortly after the occurrence, the weapons used in and the proceeds of an armed robbery were discovered in the apartment defendant shared with his girl friend. At trial, defendant's brother, who had been paralyzed in an unrelated incident occurring after the robbery, testified that he and a man he knew as "Sleepy" were the perpetrators of the robbery and that, after leaving the scene of the robbery, they went directly to defendant's apartment where they covertly hid the weapons and some of the proceeds. In addition, defendant's girl friend testified that he was with her during the time of the commission of the offense. On appeal, defendant contended that the following factors showed the existence of a reasonable doubt of his guilt: (1) the only eyewitness possessed an insufficient opportunity to observe the perpetrators, and his identification during a one-man show up was the result of suggestion; (2) his alibi was unimpeached; and (3) his brother's confession had exculpated him. After reviewing the record, the *Horton* court affirmed the conviction, holding (1) that the trier of fact was under no obligation to believe the alibi testimony over the positive identification of defendant, despite the fact that it was given by a greater number of witnesses; and (2) that the trial court's determination as to the credibility of the witnesses and the weight to be given their testimony, including the confession, would not be disturbed on review where the evidence was not so unsatisfactory as to raise a reasonable doubt of defendant's guilt.

■ Here, Ava observed the uncovered faces of defendants twice during the course of the robbery. She testified that the lobby was well-illuminated and that she stood in close proximity to defendants. In addition, she stated that she had known William from seeing him on four or five previous occasions. Moreover, proceeds of the robbery were found in an apartment to which defendants had access. Although Ava described the man she later identified as Robert as wearing dark-rimmed glasses with clear lenses and there was testimony that Anthony owned such a pair of prescription glasses and that Robert did not wear prescription glasses, we believe this factor even if characterized as a discrepancy does not destroy the positive nature of her testimony when the record is viewed as a whole. Her testimony and that of Anthony and the alibi witnesses are clearly opposed, but the jury could well have viewed the confession to have resulted from Anthony's concern for his brothers rather than from a deep sense of guilt. (*Uselding.*) The jury chose to believe Ava's testimony, and we will not substitute our judgment

for that of the trier of fact where, as here, the evidence presented is not improbable, unreasonable or unsatisfactory.

■ We would note further that while awaiting the verdict, the trial court and defense counsel engaged in an off-the-record discussion of the merits of selecting a bench rather than a jury trial. The court made some statement during the course of this discussion which indicated to defense counsel that the court doubted the guilt of defendants. This remark was brought to the attention of the trial court in defendants' post-trial motion. At this juncture, the court noted that it remembered the conversation as a generalized and hypothetical one and that the remark referred to by defendants was not intended to indicate that it believed the evidence presented was insufficient to support a guilty verdict. Under the circumstances, we find no merit in their argument that the trial court's comment entitled them to a reversal of the jury's verdict.

For the reasons stated, the judgment appealed from is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.