THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CRESENCIANO SANCHEZ *et al.*, Defendants-Appellants.

First District (5th Division) No. 80—2550

Opinion filed November 29, 1982.

Steven Clark, James F. Holderman, William T. Barker, and Patti A. Velasquez, all of State Appellate Defender's Office, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Shapiro, and Bruce A. Cardello, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MEJDA delivered the opinion of the court:

Defendants Cresenciano Sanchez and Jose Garcia Huerte (Garcia) were each charged with aggravated kidnaping, rape, and indecent liberties with a child. The charges stem from an incident in which the

defendants, aged 26 and 30, were alleged to have forcibly abducted a 14-year-old complainant from a street corner in the vicinity of her home in Chicago and then raped her at an area in Illinois near the Indiana border. Following separate jury trials, Sanchez was acquitted of the charge of indecent liberties with a child, but neither jury was able to reach a verdict on any other charge.

Prior to retrial the State filed a motion to consolidate defendants' cases for a joint trial. At the hearing on this motion defendants alleged that their defenses were antagonistic because both defendants had testified at the first trial and that the testimony of each inculpated the other. The State conceded that Garcia had made a statement inculpating Sanchez but promised to refrain from introducing it at a subsequent joint trial. The trial court concluded that separate trials were not warranted and granted the State's motion.

Following their second trial on the charges of aggravated kidnaping and rape before a single jury, Garcia and Sanchez were acquitted of kidnaping and were found guilty of rape, and were sentenced to respective sentences of 10 and 9½ years imprisonment.

On appeal, defendants contend that: (1) they were not proved guilty beyond a reasonable doubt; (2) the trial court erred in refusing to instruct the jury of the need for corroborating evidence; (3) the trial court erred in denying defendants' motion for appointment of an expert witness; and (4) the trial court erred by granting the State's motion for joinder of the defendants' cases for trial.

At the second trial, the complainant testified that at approximately 4 p.m. on April 3, 1978, she was waiting to meet her sister at the intersection of Damen, Milwaukee and North Avenues. A red Mustang car pulled up to the curb where she was standing. Garcia was driving while Sanchez rode on the passenger side. Sanchez asked her if she wanted a ride, to which she replied "No," whereupon defendants drove away.

After the car departed, complainant went inside a corner drugstore, stood there for a while, then returned to the corner to wait for her sister. After she returned to the street, defendants returned in the red Mustang. Sanchez left the car, approached her and pressed a sharp object against her side and told her to get in the car. When complainant refused, he pushed it a little harder and told her, again, to get into the car, causing her to get into the car's front seat. Sanchez then got into the rear seat. Although there were numerous people on the street, complainant made no attempt to cry out or call for help.

Once in the car, Garcia asked complainant her name but she

refused to answer. The car then pulled away from the curb as Sanchez held the sharp object to her side.

Complainant related that defendants drove her to a liquor store where Garcia got out of the car, saying "Don't try anything because it wouldn't work." Garcia went into the store. Complainant testified that it was at this time that Sanchez, seated behind her, showed her the knife he had been holding to her side. She described it as a black- and red-handled switchblade which appeared sharp. Garcia returned to the car with a bag containing beer, and they departed in the car.

As they were driving Garcia tried to make her drink some beer by pushing it into her mouth. Garcia drove the car around side streets while the defendants each drank six beers, prompting them to later stop at another liquor store. There, Garcia got out, warned complainant, "Don't forget, don't try anything," and entered the store to purchase more beer.

When Garcia returned, they drove again, first traveling through side streets, then to an expressway. At this time it was starting to get dark. They later exited the expressway and went to a house, later identified as Garcia's residence in East Chicago, Indiana. They arrived in the dark. There, defendants told complainant to get into a parked pickup truck outfitted with a camper. This vehicle was owned by Sanchez.

Complainant testified that the group then departed the house with Sanchez driving and complainant seated in the middle of the front seat between the defendants. They proceeded down a dirt road, where the complainant observed a drive-in movie and a truck stop, and stopped at a muddy, deserted field. Although she did not know where they were at the time, it was later determined that they were stopped at Wolf Lake, in Illinois, near the Indiana border.

Complainant saw no one else at the lake area, and when the truck came to a stop, defendants ordered her to get out. It was dark out, and she did not know what time it was. Complainant got out of the van and tried to run away from defendants, but Garcia chased her and tripped her. Garcia then told her to take her pants off or he would rip them off. Complainant then began to struggle and Garcia began to kiss her on the face and neck, hurting her as he squeezed her breasts. He removed her pants, then his own. Garcia told complainant she had better be good or he would kill her. He then forced his penis into her vagina. Garcia then got off of complainant, told her she "wasn't any good," and stuck an object "up her vagina." She knew this because she felt like it was tearing and ripping.

Complainant further testified that after Garcia removed the ob-

ject, Sanchez approached and he also put his penis into her vagina, and that when Sanchez finished, each defendant then had intercourse with her a second time. The defendants dressed, told complainant to dress, grabbed her by the arm, and led her back inside the van. While inside the van Garcia had intercourse with her once again. Sanchez then attempted to have intercourse with her again but she curled up and pretended to be asleep.

According to her testimony, although she feigned sleep, she never actually did sleep that night. She explained that she did not attempt to escape because both defendants were sleeping positioned against the back door of the camper. She claimed that as a result of the occurrences, she was muddy and disheveled. At the time of the incident she was five feet seven inches tall, weighing 175 pounds. By her own testimony, Garcia was shorter than she was, weighing 35 pounds less. Sanchez was of approximately the same height as the complainant and weighed 10 pounds more than she did. She stated that at no time during the intercourse by one defendant did the other defendant hold or touch her.

She further testified that upon awakening on April 4, 1978, the defendants drove her back to Garcia's residence. There, she saw Miguel De Leon, but made no attempt to cry out or to escape to him. After returning to the house, Garcia and complainant got back into the red Mustang. Garcia began to drive around, eventually coming to a liquor store, also in East Chicago, Indiana. Garcia parked the car right in front of the store. The distance from the doorway of the liquor store to the parked car was approximately six feet. Garcia told the complainant not to try anything because he would be watching her, and he could see her from the inside of the store. He then went into the liquor store. She could see Garcia in the store from where she was sitting in the car, and she made no attempt to escape, cry for help, or lock the car doors at that time.

Garcia returned to the car and drove complainant to an expressway underpass. He stopped the car and told her to get into the back seat, also telling her that it would not have to be like the night before, that she did not have to fight, and that it could be better. Garcia then left the car to urinate, at which time complainant locked the door, started the car and drove directly into a pillar support below the expressway. Garcia, angered by this, was able to open the passenger door with an extra set of keys, whereupon he grabbed her and ordered her to get into the back seat.

At this time complainant saw a man walking a dog over across some railroad tracks. Telling Garcia that she had to "go to the bath-

room," she was allowed out of the car, at which opportunity she ran to the man, Felix Kenar, asking him to help her "because the man over there wanted to rape me again."

Kenar took her to his sister's house nearby. Complainant told Kenar she wanted to go home and did not ask him to call the police, although she said he offered to do so. She testified that she did not want the people to call the police because she was afraid of the defendant, and she "was too ashamed" and because she "didn't want everybody to know."

Kenar agreed to take her to the bus station, but when they began to drive away, Garcia returned, pulling his car up to block their exit. She stated that Garcia warned Kenar not to call the police, then he sped away. Kenar and complainant then proceeded to the bus station. Kenar bought her a bus ticket and gave her some money. She boarded a bus and eventually arrived in Chicago sometime in the afternoon on April 4, 1978.

According to her testimony, after she arrived in Chicago, complainant made an attempt to call her home collect, but the line was busy. She then went to the restroom in the bus station and tried to wash some blood off of her legs and again tried to call home, but again the line was busy, so she sat down. She explained that she was so exhausted from her sleepless ordeal that she fell asleep and did not wake up until the next morning when she once again tried to call home, and once again received a busy signal. Afterwards she left the bus station, where she encountered a police officer. She asked the police officer to direct her to the Milwaukee Avenue bus, and he did so, pointing out a bus stop approximately one or two blocks away. She at no time mentioned the fact of being raped to this policeman. She caught the bus after walking a block or two. She testified that she had only a $10 bill with her at the bus station, that she paid the bus driver with the $10 bill upon boarding the bus, and that he made change for her.

She rode the bus until she recognized the area around North Avenue. She got off the bus and began walking home. While en route, she was intercepted by her stepfather and two detectives. The two detectives drove her stepfather home, and then took her to a police station. Later, police officers took her to the hospital where her parents met her. There, she reported that her neck, breasts, vagina and side hurt.

At the hospital she was treated by two doctors. One of these doctors, Dr. Nagamani Ladella, testified at the trial. At the time of the examination, Dr. Ladella was a resident covering the emergency room and had treated one to five alleged rape victims. Dr. Ladella stated

that the external examination of complainant revealed a bruise on the left side of the neck and some tenderness on the lower left side of the abdomén. The internal examination revealed a recent laceration, or tearing or rupture of the hymen, but no other lacerations or tearings in the vagina or genital area. A specimen taken using "basically" a vaginal wash revealed the presence of sperm.

Dr. Ladella observed one live sperm and some dead sperm. The presence of sperm in the vaginal smear indicated that complainant had had sexual intercourse prior to the examination. Dr. Ladella stated that if the specimen came from inside the cervix, this indicated sexual intercourse within five days prior to the examination. However, if the sample was from the vagina, sexual intercourse must have occurred during the 12 hours prior to the examination. Dr. Ladella conceded that although the specimen was obtained "basically" from the vagina, the live sperm could have come from the cervix.

Testimony at trial also established that after the complainant was released from the hospital, she went home with her mother, where she spoke with Youth Officer Bonnie Doyle. She told Officer Doyle what had happened to her and gave the officer the name and phone number of Kenar. She also gave detailed descriptions of the defendants, the red Mustang, and the pickup and camper. She also stated to Officer Doyle that she had told Kenar that a man had attempted to molest her.

On April 13, 1978, complainant spoke with Sergeant Donald Korte. On April 17, 1978, Sergeant Korte took her to East Chicago, Indiana. There, she identified the house where she had been taken and an adjacent brick or cinder block wall, each of which she had previously described to the police. She also pointed out the liquor store to which she had been taken by Garcia on April 4, 1978. She also spotted a man at the house, whom she identified as the man she had seen Sanchez speaking with on the morning of April 4, 1978, before she left with Garcia. This man was identified as Miguel De Leon.

On April 28, 1978, Sergeant Korte returned to the complainant's home and presented her eight photographs. From these, she picked out a photo of Garcia as one of her attackers. Sergeant Korte returned on May 11, 1978, and showed her another group of photographs, from which she selected a picture of Sanchez. The following day she identified Sanchez in a lineup at police headquarters. On May 17, 1978, Sergeant Korte again conducted a lineup at police headquarters, and at that lineup complainant identified Garcia. It was stipulated that both defendants were more than 14 years of age, and that neither had ever been married to the victim.

L. Herbert Capshew, the president of the corporation which provides the security guards at the Greyhound station, testified that on the day when complainant was supposed to have slept undisturbed through the night at the bus station, two guards were on duty at all times. He stated that guards have instructions to question any person who appears to be loitering around the bus station. Further, the guards are instructed to pay special attention to young people who may be runaways, especially young females. They will call the parents of a young person to verify their destination and to confirm they are not runaways. According to Capshew, the guards would not permit a young girl to sleep through the night at the bus station but would question her as to her presence.

Felix Kenar testified that he first encountered complainant as she was running or trotting at around noon on April 4, 1978. She asked him if he could help her "get away from a man," whereupon he took her to his sister's house located about 100 yards from where they met. He stated that at the moment he did not have a dog with him but that there were dogs in the yard at his sister's house. He stated that complainant had run to him from a car parked under the Indiana toll road, and that she did not mention "rape," and she did not appear to be muddy. He recalled that just as he was about to drive her to the bus station, a car pulled up blocking his egress. He stated that "a man got out and asked us to go back—to come with him. She didn't want to go, so, then he asked me, do I want to get involved? I said no, I'm just taking her to the bus." He testified further that this man did not threaten him nor tell him not to go to the police. Kenar also testified that at the time he was 71 years old and retired. He stated that after the man left, he took complainant to a bus station, gave her money, and told her to go home. He stated that complainant then gave him a phone number and told him she would let him know when she was home safely.

The testimony of Luis Berrocal, taken from the prior trial transcript, was read to the jury. Berrocal testified that on April 4, 1978, at 7:30 p.m. he saw Garcia, Sanchez and complainant walking in the direction of Garcia's house. The girl was not crying or attempting to escape, but was walking behind them in a "tranquil" manner. Although he had testified to the contrary, he recalled having told the prosecuting attorney, outside the courtroom, that the girl's pants were muddy and dirty.

Sergeant Korte testified regarding a conversation he had had with witness Kenar during which Kenar had related that complainant had told him that a man was "trying to molest her," and that a man,

namely Garcia, had told him not to call the police.

OPINION

Defendants' contention that they were not proved guilty beyond a reasonable doubt is predicated on their assertions that the testimony of complainant is implausible where she made no effort to cry out for help, made virtually no effort to escape, and failed to report the alleged rape for more than a day after her "escape," and that her testimony is contradicted by disinterested witnesses on virtually every point where such testimony is available.

■■ The issue of the plausibility of the complainant's testimony is ultimately a matter of credibility, a question best determined by the trier of fact who heard the evidence and observed the demeanor of the witnesses. (*People v. Barbour* (1982), 106 Ill. App. 3d 993, 436 N.E.2d 667; *People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) A reviewing court will not upset the finding of the trier of fact unless the evidence, on the whole, is so unsatisfactory as to raise a reasonable doubt concerning the defendant's guilt. (*Barbour; Thompson.*) The testimony of the complaining witness, if clear and convincing, is enough to support a conviction for rape (*People v. Secret* (1978), 72 Ill. 2d 371, 381 N.E.2d 285; *Barbour*), and minor discrepancies in her testimony do not render it unconvincing. (*People v. Szudy* (1982), 108 Ill. App. 3d 599, 439 N.E.2d 137; *Thompson.*) However, if clear and convincing testimony is deemed to be lacking, corroboration is necessary to sustain a conviction. *People v. Anderson* (1974), 20 Ill. App. 3d 840, 314 N.E.2d 651.

■■ Despite defendants' contrary assertion, we find no inherent improbability in the complainant's testimony. The record shows that her testimony was clear and the jury, as well as the trial court, found it convincing. We note initially that defendants have strongly argued that the instant case presents evidence as improbable as that which warranted reversal in *People v. Taylor* (1971), 48 Ill. 2d 91, 268 N.E.2d 865; however, even a cursory reading of the evidence summarized in that opinion reveals a situation wholly unlike the facts presented at bar. See 48 Ill. 2d 91, 99, 268 N.E.2d 865, 868-69.

Defendants note that complainant did not see a weapon when she was abducted nor at the time she was allegedly raped. There is no absolute standard setting the amount of force required to establish rape (*People v. Sims* (1972), 5 Ill. App. 3d 727, 283 N.E.2d 906) and each case must be determined on its own facts. (*People v. Olejniczak* (1979), 73 Ill. App. 3d 112, 390 N.E.2d 1339.) Rape can be established by the threat of force which coerces the victim to engage in sexual

intercourse, as well as by the actual use of force. (*People v. Elder* (1962), 25 Ill. 2d 612, 186 N.E.2d 27; *People v. Smalley* (1976), 43 Ill. App. 3d 600, 357 N.E.2d 93.) If the complainant's testimony is believed, defendant Sanchez pressed a sharp object to her side and ordered her to get into the car driven by Garcia. The fact that she didn't actually see the switchblade until after she had entered the car in our opinion makes her account of the events no less believable. Nor does the fact that she did not cry out to strangers nearby or at the liquor stores, or to Miguel De Leon, whom she encountered after the alleged rapes, render her story so unbelievable as to destroy her credibility. A rape victim is not required to make an outcry where it is useless or where she is restrained by fear of violence (*People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375), nor is she required to disclose the rape to the first stranger she meets immediately thereafter. (*Barbour; Jones; Sims.*) Furthermore, there is no fixed time limit within which a prompt complaint must be made. (*Barbour; Secret.*) In any event, the corroborated evidence here established that once free, complainant ran to Kenar for refuge, and that she immediately told her father and the police when she arrived home the next morning.

■ Defendants argue that the evidence is unconvincing because complainant failed to seize an apparent opportunity to escape on the morning after the alleged rape. Her testimony, however, revealed three separate escape attempts; one at the deserted lake area, another using Garcia's car, and her final successful escape to passerby Kenar. The facts of this final escape are largely corroborated by Kenar's testimony. In all, the circumstances of the complainant's attempts to resist or escape must be assessed in weighing credibility, and we find nothing in complainant's testimony here so improbable so as to destroy her credibility on these points. Regarding defendants' belief that complainant's size and weight destroy her credibility, we recognize that in a rape case it is proper to consider the disparity in size and strength of the parties (see, *e.g., Barbour*); however, this, too, was a matter for the jury's consideration. Although complainant here is a rather large 14-year-old, having a 35-pound weight advantage over Sanchez, the evidence showed that she was pitted against two unknown older men who were armed with a knife, and who took her to a remote and deserted location at night. Moreover, according to her story, she was warned to be good or she would be killed. Under these circumstances the trier of fact might well have concluded that complainant held a distinct physical and emotional disadvantage as against her two captors so as to make effective resistance or escape improbable.

Defendants also contend that the record reveals very little to corroborate complainant's story, and much which contradicts it. As noted above, the clear and convincing testimony by the complainant, even containing minor discrepancies, is sufficient to sustain a conviction for rape. (*People v. Thompson* (1978), 57 Ill. App. 3d 134, 372 N.E.2d 1052.) We believe, however, that the complainant's testimony not only satisfies this requirement, but that her story is well corroborated in many details throughout the record. From our review of the record before us, we conclude that the admissible evidence was more than sufficient to sustain the defendants' convictions.

■ The next question is whether the trial court erred in refusing to instruct the jury of the need for corroborating evidence. The requested instruction read:

"If you find, from the evidence, that the testimony of [complainant] is not clear and convincing with respect to the alleged rape, you must find that there is corroborating evidence of rape.

If you find that the evidence does not corroborate the alleged rape, you must find the defendant not guilty of rape."

The above instruction is a non-IPI instruction (see Illinois Pattern Jury Instructions, Criminal (2d ed. 1981) (hereinafter cited as IPI Criminal)), and there is no similar IPI criminal instruction. In the absence of an IPI criminal instruction, the decision whether to give a non-IPI instruction rests within the discretion of the trial judge. (*People v. Blackwell* (1979), 76 Ill. App. 3d 371, 394 N.E.2d 1329.) We find no error in the trial court's refusal to give this instruction. The jury was properly instructed in the burden of proof required, namely that they had to find, beyond a reasonable doubt, that the defendants had committed the crime of rape. (IPI Criminal No. 2.03.) We think that the jury instructions given, taken as a whole, fully and fairly defined the applicable law, were sufficient, and under the circumstances did not cause prejudice to the defendants.

Defendants next contend that the trial court erred in denying the indigent defendants' motion for appointment of an expert witness. (*People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645.) However, we are unable to reach the merits of this claim of error for the reasons set forth below.

■ At the commencement of the second trial, defendants moved for appointment of an expert medical witness. A similar motion had been denied by another trial judge prior to their earlier trials. According to appellants' brief, this expert medical testimony was crucial to refute certain opinion testimony by Dr. Ladella regarding conclusions

to be drawn from the presence of both motile and nonmotile spermatozoa in a specimen obtained from examination of complainant on April 5, 1978. Before ruling on the motion at the first trial, the former trial judge conducted a *voir dire* examination of the proposed defense witness, Dr. Gary Peterson. Following this examination the motion was denied. The record of those proceedings is not included in the record on appeal. It is the appellant's duty to provide a complete record on appeal, and the judgment of the trial court is entitled to every presumption of validity when the record is incomplete. (*People v. Butler* (1976), 41 Ill. App. 3d 750, 354 N.E.2d 568.) For an assignment of error, the record must show error; hence, the record must be preserved since on review the reviewing court is restricted in its examination to the record. (*People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944.) At the second trial, no offer of proof was made in support of defendants' motion; thus, the record before us is insufficient to demonstrate the alleged error. Under such circumstances a reviewing court must refrain from speculation and decide accordingly. (*Edwards.*) We hold that defendants have not properly preserved the record for review. Given the insufficiency of the record, we therefore indulge in a presumption in favor of the trial court's denial of the motion.

Finally, defendants contend that their conviction should be reversed since the trial court erred in granting the State's motion for joinder where the defenses were antagonistic. The State argues that the trial court properly joined the cases for trial since defendants' defenses were not shown to be so antagonistic that a severance was required.

The general rule is that separate trials are required only when the defenses are so antagonistic that a fair trial can be achieved only through severance. (*People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759.) Antagonistic defenses have been confined to situations where one or more codefendants testify implicating the other. (*Murphy; People v. Jones* (1980), 81 Ill. App. 3d 724, 401 N.E.2d 1325.) It is incumbent on the defendant to actively and specifically point out the antagonism and to show the trial court how it would be prejudiced by a joint trial. (*People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d 461.) The power to grant a severance is discretionary with the trial court, and this discretion should not be exercised arbitrarily, capriciously or in such a way as to work an injustice. (*Murphy.*) On review, we must judge the trial court's ruling on the basis of the sufficiency of petition requesting severance, considering also the representations of counsel made at the hearing on the motion. *People*

*v. McMullen* (1980), 88 Ill. App. 3d 611, 410 N.E.2d 1174; *Jones.*

Defendants' position is that allegations and arguments presented by them on the motion for joinder were sufficient to show the antagonism between their defenses. At the hearing each defendant referred to his earlier trial testimony. Sanchez had previously testified that on the evening in question he, the complainant, and Garcia had all driven in his pickup truck to a lake in Indiana. He remained there until 2 a.m., at which time he departed, leaving Garcia and the complainant in the back of the truck. He returned to the scene at 6 a.m. and found Garcia and complainant asleep in the truck.

Garcia testified at his earlier trial that he, Sanchez and complainant were at the lake area on the night in question, that he reclined in the front seat of the truck and fell asleep for an unknown time, and that after he awoke, he observed Sanchez and complainant, clothed and reclined, in the back of the truck. To the best of his knowledge Sanchez did not engage in sexual intercourse with complainant. He also testified that complainant stated "that she did not want to be in there" (the truck), and that "Mr. Sanchez wanted to do something bad to her."

Defendants claim that the latter statement shows that their defenses were antagonistic. A confession or admission by one defendant incriminating the other is ground for severance unless the State promises either to avoid introducing the statement into evidence or to delete all references to the other defendant. (*People v. Allen* (1976), 36 Ill. App. 3d 821, 344 N.E.2d 825.) Here, the State, in its motion for joinder, promised not to introduce Garcia's statement, and in view of its assurances the statement was not grounds for severance.

At the hearing on the motion, and in argument before this court, defendants contend their situations are analogous to the defenses held to be antagonistic in *Jones.* We do not agree. In *Jones,* the defendant's petition for severance alleged that a codefendant, Newbern, would testify that defendant was present at the scene of a theft, while defendant would testify that he was not present at the time the crime was committed. There was evidence that the theft occurred at around 3 p.m. on a particular day. Newbern's testimony, thus, not only placed the defendant at the scene of the crime, but directly contradicted his defense of alibi. Jones' defense counsel argued to the trial court that the evidence was expected to show a strong inference that *one* of the two persons took the money. The appellate court concluded that the representation of defense counsel showed that there would be an issue as to defendant's presence at the scene and in view of the nature of the circumstantial evidence, the issue would likely be

determinative, and would ultimately imply defendant's guilt.

No such showing was made by defense counsel here. Initially, unlike *Jones*, where the evidence and circumstances suggested that one of two defendants committed the theft, the instant case presents a situation where each defendant is alleged to have committed separate acts of intercourse with complainant during the course of the night in question. Thus, we find no reason to conclude from the testimony of either defendant that one of the two necessarily committed rape because we chose to believe the other. Moreover, in *Jones*, the determination that the defenses were antagonistic stemmed largely from the fact that the codefendant contradicted *Jones'* defense of *alibi*. (See *People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759.) Here, however, both defense counsel indicated at the hearing that Garcia and Sanchez would testify that both were present at the scene of the alleged rapes, although they disagree as to their activities and as to the sequence of events during their presence there. Thus, in our opinion neither defendant was shown to have established a potent alibi defense. See generally *People v. Fritz* (1981), 84 Ill. 2d 72, 417 N.E.2d 612.

In *Jones*, the court recognized that there are, indeed, no hard and fast rules as to when severance should be granted in a criminal case, and that each situation should be judged on its own facts. (*People v. Jones* (1980), 81 Ill. App. 3d 724, 728, 401 N.E.2d 1325, 1329.) We have carefully considered the representations of the parties made at the hearing on the State's motion for joinder. From the record we do not feel that defendants have made the required showing that their defenses were so "antagonistic" so as to require severance. Accordingly, the trial court did not err in granting a joinder.

For the foregoing reasons, the judgment of the circuit court is hereby affirmed.

Affirmed.

SULLIVAN, P.J., and LORENZ, J., concur.