THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER MOORE et al., Defendants-Appellants.

First District (4th Division)   No. 82—803

Opinion filed November 8, 1984.

506

James J. Doherty, Public Defender, of Chicago (Thomas N. Swital, Assistant Public Defender, of counsel), for appellant Christopher Moore.

Steven Clark and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant Albert Wooden.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Eddie A. Stephens, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendants, Christopher Moore and Albert Wooden, were convicted of armed violence, voluntary manslaughter, and concealment of a homicidal death. The trial judge imposed respective sentences of 12 and 18 years for armed violence, and seven-year extended terms for concealment of a homicide.

On appeal, defendants assert as reversible error (1) the denial of their motions for severance, (2) the trial court's admonition prohibiting Wooden from discussing specifics of his testimony with counsel during three brief recesses from trial, and (3) the imposition of extended-term sentences for the lesser offense of concealment of a homicidal death.

The State, based on the holding of the Illinois Supreme Court in *People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48, acknowledges that armed violence may not be predicated on voluntary manslaughter and concedes that the armed violence convictions should be vacated.

We affirm in part, reverse in part, and remand for resentencing.

BACKGROUND

The facts and events leading up to defendants' convictions were adduced at trial from the following testimony:

The State called as its first witnesses Deborah Brandon, James Banks, and Bryant Ware, all of whom live in the vicinity of Langley and Champlain streets, defendant Wooden's neighborhood, in Chicago. The testimony given by these three witnesses was corroborative.

The witnesses testified that on the night of December 12, 1980, sometime between 11:30 p.m. and midnight, they chanced to be present in the alley that adjoined Langley and Champlain streets, commonly used as a short-cut by neighborhood residents. While in the alley, each observed defendants, whom they knew as Moore and Wooden, attempting to load a large plastic bundle onto the trunk of a car. Banks testified that the plastic in which the bundle was wrapped was thick "like plastic you put in a window." Brandon testified that she had known defendant Wooden all her life and had known defendant Moore for approximately four years. Upon seeing the men in the alley, Brandon greeted Moore, and he returned her greeting.

The witnesses testified further that after defendants attempted to balance the bundle on the closed car trunk, they started to drive away, but the bundle fell to the ground. This scenario was repeated several times until the men finally abandoned their efforts, left the bundle lying in the alley, and drove away. Ware stated that after the car drove off, he saw Wooden walk through a gangway back towards his house.

Each of the witnesses returned to the alley the following morning, after learning that the plastic bundle contained the battered body of a neighborhood child, 14-year-old Gregory Grigsby. Brandon and Ware spoke to investigators present at the scene. Brandon told investigating officer Detective John Doty that she had known the victim since he was a child and that he had lived in the same block as defendant Wooden. She reported what she had witnessed in the alley the previous night and gave the investigator defendants' names.

Witness Ware also told Detective Doty what he had witnessed the night before and provided him with the name of defendant Moore. Ware testified that he had been with the victim earlier the previous evening at Ware's house, but that they had split up upon leaving. Ware stated that the victim had known defendant Wooden and had known where Wooden lived.

Witnesses Ware and Brandon testified that they subsequently and independently viewed several lineups at police headquarters, out of which they separately identified defendants Moore and Wooden as two

of the men present in the alley on the night of the crime.

The State also called as its witness Officer Adolph Alessia, who testified that on December 13, 1980, at approximately 7:30 a.m., he and his partner were on patrol when they received a call of a "man down" in the alley of South Langley Street. When the officers arrived at the scene, they observed what appeared to be "a set of legs sticking out from plastic." Officer Alessia described the plastic as clear and thick, like something that would be used to seal a window. Upon closer examination of the plastic bundle, Officer Alessia determined that it contained a body, blood, and brain matter.

Officer Alessia further testified that he observed what appeared to be drag marks or blood leading to 6412 South Langley, defendant Wooden's residence. Officer Alessia and three other police officers followed the trail of drag marks and observed a large blood spot on the walkway leading to the back porch of defendant Wooden's house. The officers observed a piece of brain matter next to the blood spot and bloodstains on the stairs of the porch. The officers knocked on the back door of Wooden's house and, receiving no response, circled around to the front. They observed that all of the first-floor windows in the front of defendant's house were broken out and had been replaced with a thick plastic, plastic similar to that in which the victim's body had been wrapped.

Defendant Wooden opened the front door in response to the officers' knocking. Officer Alessia testified that Wooden consented to the entry. Officer Alessia stated that he observed piles of the same thick, clear plastic, like that in which the body had been found, lying around Wooden's house. After asking if he could look around, Officer Alessia entered the kitchen, saw a door leading into the basement, and went downstairs.

Once inside the basement, the officer noticed that the floor was wet with puddles of standing water. He also noticed what appeared to be blood and brain matter on the side of a washer and on the floor. Wooden was placed under arrest, read his *Miranda* rights, and taken to police headquarters. Officers James May and James Mykowski, present with Officer Alessia at the scene of the arrest, corroborated Alessia's testimony.

Detective Sidney Rahim Sharif testified that on December 14, 1980, he interviewed Wooden at the Third District police station. Wooden indicated that he had concealed in a bag a knife which the victim had used to try to injure him. Wooden instructed the officers where to go to find the bag, and Sharif signed Wooden out and drove him to the site. En route, Wooden told Sharif that he had not in-

tended to kill anyone but that the victim had a knife. Wooden said he, defendant Moore, and a third man were drinking beer in Wooden's kitchen when Wooden heard a sound in the front of his house. Wooden told his friends to be quiet, because he thought someone was breaking into the house. Wooden and his friends then moved toward the front of the house, a chase ensued, and the victim ran into the basement. Wooden and his friends, picking up objects along the way, pursued the victim into the basement. Wooden picked up a table leg with a nail protruding from its base, and he and the others chased the victim around the basement, striking him with these various objects at every opportunity. Wooden struck the victim repeatedly with the table leg, knocking him to the ground and striking him every time he managed to get up. When the victim finally ceased to get up again, Wooden realized the victim was seriously injured.

Upon realizing the serious condition of the victim, Wooden and the others decided to take the victim's body out of the house. They wrapped the body in thick plastic, carried it outside, and placed it on the closed trunk of a car. After the victim's body repeatedly fell off the top of the trunk, defendant Wooden and the others abandoned their efforts, and Wooden returned home.

Detective Sharif continued to testify that Wooden directed him and his partner to a place near a fence in the alley behind Wooden's house. Wooden told Sharif that that was where he had left the plastic bag filled with bloody clothing, the table leg with which he had struck the victim, and the knife the victim had allegedly possessed. The officers recovered the bag, which contained all the items except the knife. The officers returned Wooden to the station and interviewed him again.

At this subsequent interview, defendant Wooden related yet a different version of the events leading up to the homicide. He told Detective Sharif that he had suspected the victim of having burglarized his home on prior occasions and that he had therefore been waiting and watching to see if the victim would return. When the victim did come to Wooden's house on the night of the homicide, Wooden told his friends to be quiet and allowed the victim to enter the house. Once the victim was inside, defendant and the others chased him into the basement, picking up objects as they went. Inside the basement, defendant and his friends struck the victim repeatedly. Wooden and the others chased the victim behind a furnace and struck him until he finally fell to the ground. Defendant then told Sharif the sequence of events involved in attempting to transport and finally abandoning the victim's body.

On redirect examination, Detective Sharif testified that in the first conversation with Wooden, Wooden said he had come home and found defendant Moore and the third party had killed the victim. Sharif further stated that when Wooden was confronted with a conversation Sharif had had with defendant's common law wife which was inconsistent with Wooden's earlier story about his family being home on the night of the incident, Wooden merely shrugged and admitted that he had lied.

Detective John Doty testified that on December 13, 1980, he interviewed defendant Wooden at Area One headquarters. Wooden first denied any knowledge of Gregory Grigsby's death. He then stated he would tell the truth about the incident. In the first version Wooden related to Detective Doty, he stated that he came home on the night of December 12 to find defendant Moore and another friend, who was washing a jacket. They told Wooden that "a bastard had just entered [his] house" and took him to the basement to view the victim's body. They then attempted to dispose of the body, ultimately abandoning their efforts and leaving it in the alley.

The next time Doty interviewed Wooden, it was in the presence of Assistant State's Attorney Arthur Hill. At that interview, Wooden gave the same account of the incidents that he had given Doty earlier. Doty testified that at no time during any of the versions Wooden related did he mention that the victim had a knife.

Doty testified further that on December 15, 1980, he was informed by radio that defendant Moore had been arrested and that the car that was involved in the crime had been located. Doty drove to the reported location and observed the Buick that had been used in the attempt to transport the victim's body. Doty met with defendant Moore and informed Moore that he had been implicated by Wooden in Grigsby's death. Doty testified to his interviews with Moore.

In Doty's first interview with Moore, Moore stated that he, defendant Wooden, Wooden's wife and another man were sitting around Wooden's house drinking when they found that the victim had entered the house. Defendant Wooden began to strike the victim with a hammer and the victim fled to the basement, pursued by the other men. Moore stated that Wooden and the other man continued striking the victim while Moore remained at the top of the basement to get his car. He took the body to the backyard and placed it on the trunk of his car. At that time Moore observed people coming through the alley, and he drove off.

Detective Doty testified to a second interview with defendant Moore, at which Assistant State's Attorney Arthur Hill was also

present. The story Moore related at this second interview was different from the first version of events. Moore stated that he, Wooden, and a third man were inside Wooden's house when they heard and saw three people on Wooden's front porch. Moore and the others turned out the lights and waited until the victim entered the house through the front window. Once the victim entered the house, the defendants and the other man went into the living room and began striking the intruder. The victim fled to the basement, and the others followed him downstairs. As the victim was running around the furnace, the man caught him and attempted to tie him to a post with an electric cord. The victim broke from them and tried to escape, but Moore struck him with a shoe. After the victim was dead, they went out and got the car and attempted to transport the body.

After a lineup was conducted in which Moore was identified by witnesses Brandon, Ware, and Banks, and was informed that he had been identified, Moore was interviewed by Doty and Hill a third time. At this third interview, Moore gave a third account of the events that resulted in Grigsby's death. He stated that the victim came to Wooden's house and was admitted by Wooden. Moore told Doty that Wooden and the victim talked and then went down into the basement. Moore stated that he then heard a fight coming from the basement, and he went to investigate. Once in the basement, Moore saw Wooden chasing the victim around the furnace and striking him with a knife and a hammer. Moore and the other man then joined in the chase, telling the victim to stop. The pursuers then attempted to tie the victim to a post. At that time, all of the men were striking the victim, Wooden with a knife and a hammer, Moore with his fists and a shoe, and the third man with a stick. All three men then pulled the victim out from under the laundry tray. Moore stated that the knife with which Wooden had been striking the victim had broken, and Wooden told Moore to pass him another knife. Wooden's girlfriend gave the knife to Moore, who passed it to the third man, who in turn passed it to Wooden. When they thought the victim was finally dead, they wrapped his body in the thick plastic, washed their clothing, and carried the body from the house.

Detective Doty further testified that the rear door to the basement in Wooden's house was nailed shut, leaving the stairway up to the house as the only exit. Doty also testified that he had found the basement in great disarray, splattered with brain matter and blood, and wet from being recently washed down.

Assistant State's Attorney Arthur Hill corroborated the testimony of Doty and Sharif.

Defendant Wooden then testified that on the evening of December 12, 1980, he was sitting in his kitchen with defendant Moore and another man, drinking liquor. He believed his wife and kids were upstairs. While sitting in the kitchen, he heard someone "bothering the venetian blinds" on the living room window. He stated that he had been burglarized some two days before. He listened quietly while the "bothering" continued. He then went to the front of the house to see what was happening and saw someone standing in the living room. When the intruder saw Wooden, he ran into the kitchen and down into the basement. Wooden followed him. Inside the basement, Wooden turned on the lights and announced that whoever was there should come out. Defendant Moore and a third man followed behind Wooden. The basement was dimly lit and filled with clothes drying on the clotheslines. Wooden began going through the hanging clothes, looking for the victim. He saw the feet of the victim when defendant Moore warned that the victim had a knife. Wooden saw the knife one time. The victim made motions toward Wooden with the knife. Wooden then picked up some objects from the floor and started throwing them at the victim. Wooden again told the victim to come out and, getting no response, continued to hit him with the benailed table leg. Wooden stated that he was fearful the victim would attempt to grab or cut him. Wooden testified that the other two men were also throwing things at the victim. Wooden continued to strike the victim with the table leg until the victim fell to the ground. The victim got up and ran behind the furnace. Wooden assumed that the victim still had a knife but he did not see it. Wooden went behind the furnace to get the victim out, continuing to strike him with the table leg. He, defendant Moore, and the third man were all hitting the victim. The victim finally fell out from behind the furnace and did not get up again. The victim appeared to be dead, and Wooden then recognized him as Gregory Grigsby. Defendant then wrapped the body in sheets and plastic and carried it upstairs and out of the house.

Once in the alley, Wooden saw some witnesses coming out of the gangway. After attempting to transport the body on the trunk of the car, Wooden abandoned the effort and went back to his house, where he commenced to wash down the basement. He put the table leg, the knife used by the victim, and some bloody clothes in a plastic bag and put the bag outside by a fence in the alley. When asked about the absence of the knife from the retrieved plastic bag, Wooden testified that he thought he put the knife in the bag but that it could have cut through the bag because the bag was made of "thin plastic." He testified, however, that the plastic was the same thick, industrial type that

the officers had found lying in piles around his house. Wooden admitted that he had seen the victim with a knife only once and that he did not know whether the victim had dropped the knife at some point during the struggle.

Dr. Joanne Richmond performed the autopsy on the 14-year-old victim. Among other details, Dr. Richmond testified that the victim had a six-inch by four-inch laceration on the side of his head, under which his skull had been fractured. Much of the victim's brain had been lost through this gaping wound. The victim also had a five-inch laceration on the back of his head and three other lacerations on the other side of his head. He also had a wound on the back of his neck, consistent with having been struck by a knife. He had multiple abrasions and bruises all over his body, consistent with defensive wounds. The cause of death was cranial cerebral injury due to a beating.

A bench trial was held in the circuit court of Cook County, and defendants Moore and Wooden were convicted of armed violence, voluntary manslaughter, and concealment of a homicidal death. They were sentenced, respectively, to 12- and 18-year terms for armed violence, and each was sentenced to a seven-year extended term for concealment of a homicide. They now appeal their convictions and sentences.

OPINION

# I

■■ The first claim of error raised on appeal is that the trial court abused its discretion in denying defendants' motions for severance. Defendants specifically claim that the court erroneously considered an element of Moore's confession in finding defendant Wooden guilty and that the evidence was so voluminous and complex as to mandate separate trials. The State refutes this argument by pointing out that the trial court repeatedly and explicitly informed defendants, both prior and subsequent to any testimony being given, and particularly with reference to the statements of defendant Moore, that any statements made by codefendants would be considered only in connection with the case of the declarant. Such admonitions are supported by the record and prevent us from finding that the trial court abused its discretion in denying severance.

A trial court is clothed with substantial discretion in ruling on a motion for severance. (*People v. Peterson* (1982), 108 Ill. App. 3d 856, 439 N.E.2d 1103.) Its exercise of discretion will not be reversed absent a finding of abuse. (*People v. Lee* (1981), 87 Ill. 2d 182, 429 N.E.2d

461.) An accused does not have a right to be tried separately from his codefendants when charged with offenses arising out of a common occurrence (*People v. Ruiz* (1982), 94 Ill. 2d 245, 447 N.E.2d 148); thus, as a general rule, defendants jointly indicted are to be jointly tried. *People v. Clark* (1979), 71 Ill. App. 3d 381, 389 N.E.2d 911.

An exception to this general rule of joint trials exists where the defenses of codefendants are so antagonistic that a fair trial can be achieved only through severance, or where one defendant has made an out-of-court statement that inculpates another defendant and such statement is likely to be admitted into evidence. (*People v. Sanchez* (1982), 110 Ill. App. 3d 893, 443 N.E.2d 252.) This latter situation, commonly referred to as a *Bruton* problem (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), is what defendants here claim as error.

As this court has previously noted, *Bruton* concerned itself with the limitations on the ability of a jury to restrict their consideration of inadmissible, inculpatory evidence, not with the ability of an experienced trial court judge. (*People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926.) A trial judge, sitting as the trier of fact, due to his particular training and experience, is generally believed to have a greater ability to restrict his use of improper evidence and to consider only competent evidence. (*People v. McNeal* (1977), 56 Ill. App. 3d 132, 371 N.E.2d 926.) This increased capacity to "compartmentalize his consideration of evidence" suggests that the denial of a motion for severance by a trial judge, sitting as the trier of fact in *Bruton* types of situations, does not deprive the defendant of a fair trial. *People v. McNeal* (1977), 56 Ill. App. 3d 132, 138, 371 N.E.2d 926, 931-32.

Here, prior and subsequent to any testimony being given concerning the statements of defendant Moore, the learned trial judge admonished defendants that any statements made by a codefendant would be considered as applicable only as to the declarant. In reference to Moore's statement, at the time it was admitted into evidence the trial judge specifically stated that it would not be considered as to defendant Wooden. In addition, the State, in closing argument, acknowledged that any statements of the defendants, to the extent that they differed, were "useable only against the declarant in each case."

The issue, as phrased by the trial court, after it explicitly declared that it had no intention of allowing a *Bruton* violation, is whether the court could find beyond a reasonable doubt that the evidence before it, excluding Moore's statement, was adequate to support a conviction. The experienced trial judge found that it was. Our careful review of the record and the overwhelming amount of testimony ad-

duced at trial convinces us that the trial court, in denying defendants' motion for severance and in finding defendant Wooden guilty beyond a reasonable doubt, excluding the *Bruton* statement, did not err.

## II

■ Defendants next claim as error the trial court's admonition to defendant Wooden not to discuss specifics of his testimony with his attorney during three brief recesses from trial. Defendant claims he had a right to consult with counsel, not just on matters of strategy but on his testimony as well. The State, on the other hand, argues that the trial court acted properly in directing defendant not to discuss specifics of his testimony with his attorney during the two 10-minute recesses and the lunch break where defendant (1) did not object, (2) neither requested nor indicated a need to confer with counsel, and (3) was not prejudiced due to the brevity of the recesses involved. Because the error as claimed potentially threatens a substantial right of the accused, we will consider the issue under the doctrine of plain error. *People v. Sparkman* (1979), 68 Ill. App. 3d 865, 386 N.E.2d 346.

■ As the State readily acknowledges, a defendant's right to effective assistance of counsel may not be denied. (U.S. Const., amend. VI.) The issue here is whether a trial court's admonition to a defendant still subject to cross-examination, warning him not to discuss the specifics of his testimony with his attorney during three brief recesses, when no such discussion has been requested, no legitimate need for it has arisen, and defendant has been informed that he may consult with counsel on all other matters, constitutes a denial of an accused's sixth amendment right. Our reading of the applicable law persuades us that defendant's rights have not been violated.

Relying on *Geders v. United States* (1976), 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330, *People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96, and *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 394 N.E.2d 496, defendant urges that the limits the trial court placed on his right to confer with his attorney denied him effective assistance of counsel. A similar argument was made in *People v. Seider* (1981), 98 Ill. App. 3d 175, 423 N.E.2d 1217, in which defendant was instructed by the court not to discuss his testimony with "anyone" during a short recess. The *Seider* court, after finding that the issue had been waived, distinguished *Geders* and *Noble* as follows:

> "Unlike *Geders v. United States* and *People v. Noble*, wherein the defendant was prevented, over defense counsel objection, from consulting with his attorney during an overnight recess, defense counsel in the instant case never requested or indicated

a need to confer with defendant. Nor did defendant request to consult with counsel. Additionally, the recess was not overnight but rather a "short" break between direct and cross-examination." *People v. Seider* (1981), 98 Ill. App. 3d 175, 189, 423 N.E.2d 1217, 1227.

Similarly, in *People v. Pendleton,* the appellate court held that an attorney may consult with a witness regarding his testimony even after the witness is placed on the stand, *"provided* a legitimate need arises for such a discussion." *People v. Pendleton* (1979), 75 Ill. App. 3d 580, 594, 394 N.E.2d 496, 507.

The supreme court in *Noble* explicitly stated that it did not mean to imply that a trial court may never, under any circumstances, impose limited restrictions on a defendant's freedom to consult with counsel. *People v. Noble* (1969), 42 Ill. 2d 425, 248 N.E.2d 96.

The circumstances of the instant case justified the trial court's imposition of limited restrictions on defendant Wooden's right to consult with counsel. Here, defense counsel neither requested nor indicated a need to confer with defendant Wooden, nor did defendant Wooden request to consult with counsel. The trial court specifically and repeatedly told Wooden that he could discuss with his attorney things other than his testimony. The recesses involved were of very brief durations, and, following the lunch recess, the court, after asking defendant if he had spoken to his attorney and learning that he had not, *sua sponte* and over the State's objection, allowed defendant to meet with counsel, alone, behind the closed doors of the conference room. Under these particular circumstances, we find that the limited restrictions imposed on defendant by the trial court did not constitute a denial of defendant's effective assistance of counsel.

### III

■ As their final claim of error, defendants contend that the trial court erred in imposing extended-term sentences for their convictions of concealment of homicidal death when that offense is a lesser offense than voluntary manslaughter, of which defendants also stand convicted. Relying on the Unified Code of Corrections, section 5—8—2(a) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)) and *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, defendants assert that an extended-term sentence may only be imposed for the most serious class of offense of which the offender is convicted. In the recent consolidated case *People v. Jordan* (1984), 103 Ill. 2d 192, the Illinois Supreme Court interpreted section 5—8—2(a) (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)) of the Unified Code of Corrections. That inter-

pretation supports defendants' position.

Section 5—8—2(a) provides, in pertinent part:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a).

Section 5—8—2(a) was first considered by our supreme court in *People v. Evans* (1981), 87 Ill. 2d 77, 87-88, 429 N.E.2d 520, 525, in which it was stated:

"When section 5—8—2(a) is read in conjunction with section 5—5—3.2, it is clear from the plain language of the statutes that the most serious offense of which the offender is convicted must be accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. ***

We recognize that the present legislative scheme could lead to the anomalous result of insulating a defendant from receiving an extended sentence for an offense accompanied by wanton cruelty by virtue of his conviction of a more serious offense."

In *Jordan*, the supreme court found that *Evans* was dispositive of the issue and explained as follows:

"As stated in *Evans*, the plain language of section 5—8—2(a) requires that, when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class and only if that offense was accompanied by brutal or heinous behavior." *People v. Jordan* (1984), 103 Ill. 2d 192, 206.

Here, defendants were convicted of armed violence, voluntary manslaughter, and concealment of homicidal death. The State concedes that the armed violence convictions, because they were predicated on voluntary manslaughter, must be vacated. (*People v. Alejos* (1983), 97 Ill. 2d 502, 455 N.E.2d 48.) Defendants, therefore, stand convicted of voluntary manslaughter and concealment of homicidal death. Voluntary manslaughter is a Class 1 felony. (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(c).) Concealment of homicidal death is a Class 3 felony. (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.1.) Under the supreme court's interpretation of the extended-term statute (Ill. Rev. Stat. 1983, ch. 38, par. 5—8—2(a)), where, as here, defendants have been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class. Because concealment of homicidal death is not within the

most serious class, namely Class 1, imposition of an extended-term sentence for conviction of this lesser offense was improper. The sentences imposed for this offense must therefore be reduced.

For the reasons stated herein, we affirm defendants' convictions for voluntary manslaughter and concealment of homicidal death, vacate defendants' armed violence convictions, vacate the sentences imposed for the convictions of concealment of homicidal death, and remand for resentencing.

Affirmed in part, vacated in part, and remanded.

JOHNSON and ROMITI, JJ., concur.